**VIKING THEATRE CORPORATION, Appellant,**

v.

**PARAMOUNT FILM DISTRIBUTING CORPORATION et al., Appellees.**

No. 13756.

United States Court of Appeals Third Circuit.

Submitted July 24, 1963.

Decided June 21, 1963.

Edward Bennett Williams, Washington, D. C. (Williams & Stein, Washington, D. C., Drinker Biddle & Reath, Philadelphia, Pa., Harold Ungar, Washington, D. C., Henry W. Sawyer, III, R. Philip Steinberg, David W. Maxey, Philadelphia, Pa., on the brief), for appellant Viking Theatre Corp.

Morris Wolf, Philadelphia, Pa. (Franklin Poul, Philadelphia, Pa., on the brief),

for appellees Stanley-Warner Management Corp. and Stanley Co. of America.

Louis J. Goffman, Philadelphia, Pa., Wolf, Block, Schorr & Solis-Cohen, Philadelphia, Pa., on the brief, for Warner Bros. Dist. Corp.

Louis Nizer, Phillips, Nizer, Benjamin, Krim & Ballon, New York City, for appellee Loew's Inc.

Louis Nizer, Phillips, Nizer, Benjamin, Krim & Ballon, New York City, W. Bradley Ward, Schnader, Harrison, Segal & Lewis, Philadelphia, Pa. (Gerald F. Phillips, Albert F. Smith, New York City, Wm. A. Schnader, Arlin M. Adams, Bancroft D. Haviland, Shirley S. Bitterman, Philadelphia, Pa., on the brief), for appellees Metro-Goldwyn-Mayer, Inc., Columbia Pictures Corp., United Artists Corp., Universal Film Exchanges, Inc., and Paramount Film Distributing Corp.

Edwin P. Rome, Blank, Rudenko, Klaus & Rome, Philadelphia, Pa. (Morris L. Weisberg, Philadelphia, Pa., on the brief), for defendant-appellee William Goldman Theatres, Inc.

Charles F. Young, Royall, Koegel Rogers, New York City (Ralph Earle II, Arthur Littleton, Morgan, Lewis & Bockius, Philadelphia, Pa., Royall, Koegel & Rogers, New York City, on the brief), for appellees Twentieth Century-Fox Film Corp. and Fox Philadelphia Building, Inc.

Before BIGGS, Chief Judge, and GANEY and SMITH, Circuit Judges.

WILLIAM F. SMITH, Circuit Judge.

This is an action under the antitrust laws, and particularly under Sections 4 and 16 of the Clayton Act, 15 U.S.C.A., 15 and 26. The plaintiff is the owner and operator of a first-run motion picture theatre [1] located in downtown Philadelphia. The defendants are three exhibitors,[2] whose theatres are in competition with that of the plaintiff, and six major distributors [3] of motion pictures. The complaint alleges generally that during the period here in question the defendants were engaged in a conspiracy to restrain trade in violation of Section 1 of the Sherman Act, 15 U.S.C.A. 1; the allegation is denied in the answers.

The plaintiff charges specifically that the defendants entered into or consciously adhered to certain agreements, the objects of which were to maintain an equal division of product among the defendant exhibitors and to eliminate the plaintiff from the competitive market. It is argued that each of the defendant distributors, in furtherance of the objects of the said agreements, engaged in conduct from which it may be inferred that an illegal conspiracy existed. This conduct is said to have consisted of:

(1) the routine rejection of "superior" bids or offers submitted by VIKING, and the allocation of films to the defendant exhibitors pursuant to the said agreements;

(2) the requirement that VIKING offer "excessive" rentals as a prerequisite to its right to license film;

(3) the adjustment of film rentals and playing time for the defendant exhibitors and the denial of similar adjustments to VIKING;

(4) the requirement that VIKING, but not the defendant exhibitors, submit written bids;

(5) the imposition of discriminatory advertising conditions on VIKING;

---

1. A "first-run" theatre is one which exhibits feature films that have not been shown theretofore within the area.

2. William Goldman Theatres, Inc., (GOLDMAN); Stanley Company of America and Stanley Warner Management Corporation (STANLEY WARNER); Fox Philadelphia Building, Inc. (Fox).

3. Paramount Film Distributing Corporation (PARAMOUNT); Warner Bros. Pictures Distributing Corporation (WARNER BROS.); Metro-Goldwyn-Mayer (METRO); Columbia Pictures Corporation (COLUMBIA); United Artists Corporation (UNITED); Universal Film Exchanges, Inc., (UNIVERSAL); Twentieth Century-Fox Film Corporation (TWENTIETH CENTURY).

(6) the requirement that VIKING make extensive commitments as to playing time in order to license film;

(7) the institution of discriminatory law suits against VIKING; and

(8) the requirement that VIKING license unwanted pictures in order to obtain those it desired.

A full and detailed discussion of these charges will follow.

The action came to trial before the Court and a jury. At the close of the plaintiff's evidence and on the motion of the defendants, the Court directed a verdict in favor of the defendants on the ground that the evidence was legally insufficient to sustain either the charge of conspiracy or the claim that the plaintiff had been injured in its business. This appeal is from the judgment entered on the said verdict. The plaintiff challenges as erroneous the said ruling of the Court, and in addition thereto, several rulings which resulted in the exclusion of certain evidence.

■ The plaintiff argues that notwithstanding "the erroneous exclusions" of certain evidence, the evidence in the record was sufficient as a matter of law to support the charge of conspiracy and to warrant the submission of the case to the jury. The determination of the legal issue raised by this argument requires consideration of the evidence in its entirety, and as it relates to each of the defendants. The evidence, including the inferences of which it is reasonably susceptible, must be viewed in the light most favorable to the plaintiff. Continental Ore Co. v. Union Carbide & Carbon Corp., 370 U.S. 690, 696, 697, 82 S.Ct. 1404, 8 L.Ed. 2d 777 (1962); Delaware Valley Marine Sup. Co. v. American Tobacco Co., 297 F. 2d 199 (3rd Cir.1961), cert. den. 369 U.S. 839, 82 S.Ct. 867, 7 L.Ed.2d 843 (1962). The question is whether the evidence thus viewed was legally sufficient to warrant submission of the case to the jury.

## DISTRIBUTION OF MOTION PICTURES

The distribution of films constitutes the wholesaling sector of the motion picture industry. Because of the cost of reproducing a film print from the master negative, only a limited number of prints of each picture are available for distribution. The distributors procure the prints from producers and license them to exhibitors for a limited time on a rental basis. The pictures are distributed nation-wide, and it is through the distributors that all exhibitors must obtain prints for exhibition. It is the objective of the distributors to secure the greatest amount of film rental which can be realized from the exhibition of their films throughout the country.

This action encompasses a period of 123 weeks, between July 2, 1954, and November 13, 1956, during which the defendants distributed approximately 420 pictures for first-run exhibition. There were twelve theatres in the downtown Philadelphia area engaged in the first-run exhibition of films. The number of exhibitors competing for a particular picture depended generally upon the exhibitors' opinions of the grossing potential of the film, the availability of open playing time, and other factors hereinafter discussed. There were many times in which only one exhibitor manifested an interest in licensing particular pictures; there were other times in which several exhibitors manifested such an interest.

The nature of the charges made here requires some consideration of the quality of the films distributed by the defendants. The term "quality," in the context of this suit, is meaningful solely in the sense that it represents the earning power of a particular film. The earning power can be determined only after the film has been exhibited. There is in evidence a stipulation which shows the national film rental [4] earned by each picture distributed by the defendants. The national film rental reflects neither the total

4. "National film rental" is the total rental earned by a picture from its exhibition throughout the country.

gross achieved by a picture nor its earning power in any particular area. However, absent any other evidence, the criterion may be regarded as some indication of earning power.

The national film rental earned by pictures distributed by the defendants varied over a wide range. The stipulation reflects the film rental earned by only 405 of the pictures distributed. Of this number, 195 earned less than $1 million, and among these were 107 which earned less than $500,000. Of the 210 films earning more than $1 million, 101 earned more than $2 million, 55 earned more than $3 million, 34 earned more than $4 million, and 19 earned more than $5 million. There were only 11 pictures which earned more than $6 million.

## METHODS OF DISTRIBUTION

The evidence in this case discloses that the defendant distributors in several respects followed a general pattern in the distribution of feature films for first-run exhibition. It was their usual and customary practice to give notice to the exhibitors of the expected release of films and the approximate dates of availability.[5] The exhibitors were then afforded the opportunity to "screen"[6] the pictures at places designated by the distributors. The films were licensed theatre by theatre and picture by picture. There was otherwise little similarity in the methods employed.

Films were usually licensed on a competitive basis but practices varied from distributor to distributor. There were instances in which the distributors solicited competitive bids, reserving the right to reject all bids and to thereafter negotiate with interested exhibitors. There were other instances in which the exhibitors were requested to submit offers which were then used as a basis for negotiation. There were still other instances in which the distributors would invite selected exhibitors either to submit bids or to negotiate for particular pictures. The method employed, and any variance therefrom, was the independent and individual choice of each distributor.

Terms and conditions of both bids and offers varied from exhibitor to exhibitor and picture by picture. Film rental was usually based on a percentage of gross receipts. There were proposals in which film rental was based on a flat percentage of weekly gross receipts less house costs for each week, the percentage remaining constant. There were others in which film rental was based on a scale of percentages adjusted downwardly week by week. There were still others in which film rental was based on a sliding scale of percentages, the proposal providing for the upward or downward adjustment of percentages within certain limits, depending on gross receipts. Offers and bids were frequently accompanied by cash guarantees which were payable in the event earned film rental fell below the amount of the guarantee.

The evidence shows that it was customary for bids and offers submitted by the exhibitors to include provisions fixing responsibility for the payment of advertising expenses. In most instances, this responsibility was shared by the distributors and the exhibitors on a percentage basis. The share of advertising expense to be borne by each party often corresponded with the percentages provided for the payment of film rental. In other cases, the percentage of advertising expense was arbitrarily selected, with no relation to film rental terms. In still other cases, bids and offers remained silent on the matter of advertising, it being understood that further negotiations were contemplated. In each case, the responsibility for determining the amount and type of advertising for any picture remained with the distributor.

Exhibitors ordinarily indicated the date upon which they proposed to commence the exhibition of a picture. It was

5. Date of availability is the choice of the distributor and indicates his preference as to the approximate date on which the picture shall open in first-run theatres.

6. Feature films are privately shown to exhibitors to afford them the opportunity to evaluate the pictures and their earning potential.

important to the distributors that this date correspond with the availability date because of the importance of the latter date in the predetermined pattern of national exploitation. Changes in opening dates were negotiated in some instances to accommodate exhibitors, the final decision as to any change resting exclusively with the distributor.

Bids and offers submitted by exhibitors also provided for the length of playing time to be afforded a film. The length of playing time varied from picture to picture. In most cases the exhibitors guaranteed a minimum playing time, with any additional time contingent on the realization of a fixed minimum in gross receipts. In other cases there was solely a guaranteed minimum playing time, with no provision for additional time. There were several cases in which the length of playing time was determined by negotiations subsequent to the opening date of the picture. The evidence indicates that the exhibitors were, on occasion, permitted to exhibit a picture for a shorter period than that provided by the licensing agreement, and, on other occasions were requested by the distributors to terminate the exhibition of a film short of the agreed date. Any adjustment in the guaranteed playing time required the consent of the distributor.

### EVALUATION OF BIDS AND OFFERS

As heretofore noted, distributors of motion pictures are primarily concerned with the maximum return of rental from the exhibition of films throughout the country. Prior to the release of a picture the distributor endeavors to evaluate it in terms of earning potential. This evaluation requires consideration of such factors as the intrinsic merit of the film, the prospects of public acceptance, and the setting of the film in an overall national release pattern. While earning potential cannot be determined with precision, it plays a significant role in the licensing of film.

There are numerous factors which, in the judgment of the distributor, may be determinative of the relative superiority of the bids and offers submitted and of the degree to which they correspond to the expected earning potential of the picture. The financial terms and conditions proposed by the exhibitor are, of course, important. Also of importance are the earning and exploitation potential of the theatres, as may be indicated by their locations and seating capacities, their performance records, the experience of their management, the suitability of their accommodations, and their standards of maintenance. Additional considerations of consequence to the distributor, as hereinabove noted, are the opening date and the proposed length of playing time. Finally, as in any business relationship, the distributor will be concerned with the commercial practices of the exhibitors and their financial integrity.

The final account between the exhibitor and the distributor is settled at the conclusion of the exhibition period. The settlement involves a determination of the film rental earned and payable, and the allocation of the advertising expenses. The evidence shows that the final accounting resulted on occasion in the downward adjustment of the agreed film rental terms. These adjustments were essentially rebates and were negotiated in those cases where a distributor responded to a complaint that an exhibitor had incurred losses from the exhibition of a film. The grant of an adjustment was within the sole discretion of the distributor.

### HISTORY AND PERFORMANCE OF VIKING THEATRE

The plaintiff is the owner of the Viking Theatre, which was purchased from the defendant STANLEY WARNER in 1953. Prior to its acquisition by the plaintiff the theatre had been operated as a first-run house under the name of the Aldine. When control of the Stanley Warner circuit was acquired by Simon Fabian, also in 1953, he decided to sell the theatre for commercial purposes and thus eliminate it as a theatre. The decision was prompted by the then existing scarcity of pictures and the fact that the theatre

had been operating at a loss. When Simon Fabian learned that it was the intention of the plaintiff to renovate and operate the theatre, he attempted to repurchase it, but the parties failed to agree on the price. The theatre was completely renovated, and thereafter, on July 2, 1954, opened as a first-run house.

It is here conceded that the plaintiff, by letters addressed to each of the defendant distributors, requested the opportunity to either share in or bid for available pictures suitable for exhibition in a first-run theatre. Thereafter, and during the period in suit, the plaintiff licensed and exhibited first-run pictures. At the same time there were in the area eleven other first-run theatres, and of this number, seven were owned by the defendant exhibitors and four were owned by non-defendants. These exhibitors were actively engaged in competition for available pictures. The names of the theatres, their ownership, location and seating capacities, are set forth in Appendix A.

The plaintiff made known to the distributors its interest in eighty-seven pictures and, of these, licensed and exhibited thirty-four. Films were licensed to VIKING on bids submitted as well as by competitive negotiation. The pictures sought and not obtained by VIKING were licensed to non-defendant as well as defendant exhibitors. Of the films licensed to VIKING, twenty-one had a national film rental in excess of $1 million, and of these, eight had a national film rental in excess of $2 million; two had a national film rental in excess of $3 million, and of these, one had a national film rental in excess of $6 million.

The VIKING opened on July 2, 1953, with a picture licensed from METRO. Thereafter, for a period of a year, it exhibited METRO product almost exclusively and manifested little interest in the pictures of other distributors. The plaintiff licensed nine of ten METRO pictures on which it submitted bids. The harmonious business relationship between plaintiff and METRO continued until June of 1955, when a dispute arose over film ren-

tal and advertising expenses. As a result of this dispute VIKING discontinued the relationship until August of 1956, when it submitted an offer for the picture "Tea and Sympathy."

The only UNITED picture on which the plaintiff submitted a bid during its first year of operations was "Barefoot Contessa." The bid, submitted on October 5, 1954, was rejected and the film was licensed to GOLDMAN. The second year of VIKING's operations opened with "Not As A Stranger," one of the two best pictures distributed by UNITED during the entire period of suit. This picture was licensed to the plaintiff on a bid submitted on April 25, 1955. Thereafter, the plaintiff manifested an interest in sixteen additional pictures and licensed eleven, three on bids and eight by negotiation.

The evidence in this case shows that the product of TWENTIETH CENTURY was available to all exhibitors and was licensed on the basis of open competitive bidding. The plaintiff did not become interested in TWENTIETH CENTURY pictures until after March 1955, when Jay Wren became manager of the VIKING. The plaintiff submitted bids on fifteen pictures, and, of these, licensed and exhibited eight; the others were licensed to Fox. The average national film rental of the pictures licensed to VIKING was one million two hundred thousand dollars.

The plaintiff first endeavored to obtain UNIVERSAL product in April of 1955, when it submitted an offer on "Fox Fire," a picture which had a national film rental in excess of one million five hundred thousand dollars. This bid was withdrawn. In the latter part of 1955, the plaintiff negotiated for, and was granted a license on, "All That Heaven Allows," on the condition that it also license three additional pictures. Thereafter, the plaintiff manifested no interest in UNIVERSAL product until after the period in suit.

The plaintiff submitted offers on only three of the seventy pictures distributed by COLUMBIA. These offers were rejected, and thereafter two of the films were li-

censed to GOLDMAN and one to STANLEY WARNER. The plaintiff submitted bids on thirteen of the thirty-nine pictures distributed by PARAMOUNT but was granted a license on only one. The plaintiff submitted bids on ten of the forty-eight pictures distributed by WARNER BROS., and licensed one, which was exhibited after the period in suit. Licenses for five were granted STANLEY WARNER, and licenses for four were granted GOLDMAN.

## DIVISION OF PRODUCT

When the plaintiff entered the market in 1954, there was in effect between GOLDMAN and STANLEY WARNER an agreement which contemplated a "split" [7] of certain pictures of each distributor. The defendants METRO and UNITED acquiesced in the arrangement prior to March of 1953, subject to their right to solicit competitive bids on each picture and, upon the rejection of all bids on any picture, to negotiate with interested exhibitors. There is no direct evidence that COLUMBIA or UNIVERSAL acquiesced in the split, but their pictures were, nevertheless, included on lists prepared by STANLEY WARNER and GOLDMAN.[8] We entertain serious doubt that anything other than independent judgment motivated the decisions to split product. However, resolution of the issue will not be necessary to the decision in this case.

The evidence shows that the agreement between STANLEY WARNER and GOLDMAN imposed no obligation on the distributors to include particular pictures on the list or to deal exclusively with the said exhibitors. The evidence affirmatively shows that every exhibitor was afforded the opportunity to bid or negotiate for the pictures of each distributor; in fact, many of the pictures listed on the split were licensed to non-defendant first-run theatres, including the plaintiff. It was further shown that the agreement imposed no obligation on the defendant exhibitors to bid or negotiate for the pictures on their respective sides of the split.

The defendant PARAMOUNT agreed to a split of its product between STANLEY WARNER and GOLDMAN in March of 1953, subject, however, to its right to solicit competitive bids from all exhibitors and for all pictures.[9] Later in the same year the split arrangement was modified in order to resolve a controversy arising out of GOLDMAN's consistent refusal to bid for PARAMOUNT's pictures. It was agreed that GOLDMAN would not be required to submit bids, but the effect of the modification is otherwise not clear. However, there is evidence from which it may be inferred that the agreement [10] as construed by PARAMOUNT, contemplated exclusive negotiations with either STANLEY WARNER or GOLDMAN upon the rejection of all bids for any picture included on its split. This construction is refuted by most of the evidence, but we, nevertheless, accept it as the correct one for the purpose of argument.

## ALLEGED CONSPIRACY

The plaintiff alleges that during the period in suit the defendants engaged in a conspiracy, the object of which was to deprive it of quality pictures,[11] on terms and conditions comparable to those afforded the defendant exhibitors. It is argued that the existence of the conspiracy is evidenced by the split system, the agreement between GOLDMAN and PARAMOUNT, and the actions of the defendants.

The plaintiff argues preliminarily that a split system, which, as here, does not include all exhibitors in the competitive area, constitutes a per se violation of

---

7. A "split," which was in common use in the industry, is in essence an agreement between exhibitors to divide product and to refrain from bidding against each other for pictures on their respective sides of a prepared list.

8. The pictures of TWENTIETH CENTURY were not split between STANLEY WARNER and GOLDMAN. They were customarily exhibited by Fox.

9. WARNER BROS. acquiesced in the split at the same time.

10. Herein identified as the "Paramount Agreement."

11. The criterion employed by the plaintiff is the national film rental of each picture.

the antitrust laws. It is not argued that all split systems are illegal; the substance of the plaintiff's argument is that those which do not include all exhibitors are per se illegal. We do not agree. We have heretofore noted that each exhibitor was at all times afforded the opportunity to license the pictures of each distributor notwithstanding the split. There is no evidence that any exhibitor requesting participation in the split of product would have been excluded.

■■ We are of the opinion that the failure to include all exhibitors in the split system will not render it illegal in the absence of evidence that it was so employed as to unreasonably restrict the competitive market, or had this result. Brown v. Western Massachusetts Theatres, Inc., 288 F.2d 302 (1st Cir.1961); Schad v. Twentieth Century-Fox Film Corporation, 136 F.2d 991 (3rd Cir.1943). There is no evidence in this case that the split system, standing alone, had this effect, or was so intended. Therefore, we decline to hold the split system to be per se illegal, and we do not consider the system, standing alone, as evidence of a conspiracy to violate the antitrust laws.

Plaintiff advances the argument that the split system resulted in an artificial price structure which gave the defendant exhibitors a competitive advantage over other exhibitors. The argument lacks validity because of the absence of evidence that the split had this effect. There is no evidence in this record from which it may be inferred that any artificiality of price structure existed; in fact, plaintiff made no attempt to offer such evidence.

■■ As an alternative, the plaintiff takes the position that the agreement made by STANLEY WARNER and GOLDMAN with PARAMOUNT so modified the split as to render it unlawful, and that the agreement constitutes direct evidence of an illegal conspiracy. The illegality is said to arise from the requirement that PARAMOUNT negotiate exclusively with either STANLEY WARNER or GOLDMAN upon the rejection 'of all bids for inadequacy. The agreement may not be held illegal within the framework of this case unless the other distributors gave their adherence to the plan and participated in it. Interstate Circuit v. United States, 306 U.S. 208, 222, 59 S.Ct. 467, 83 L.Ed. 610 (1939); Binderup v. Pathe Exchange, 263 U.S. 291, 312, 44 S.Ct. 96, 68 L.Ed. 308 (1923). Essential to the violation of the antitrust laws is an agreement or combination, the purpose and effect of which is restraint of trade and suppression of competition.

The plaintiff urges that in fact each of the other distributors, having knowledge of the Paramount Agreement, acquiesced in and adhered to it. While there is no direct proof to this effect, the plaintiff argues that the evidence as to the course of conduct followed by each distributor was sufficient to support the inference of concerted action pursuant to a common understanding. The crucial question is whether there was sufficient evidence from which a jury could infer that such concerted action existed.

The plaintiff refers to those alleged instances wherein pictures appearing on either the STANLEY WARNER or GOLDMAN side of the "split" lists were licensed to them on the basis of exclusive negotiation after bids of all interested exhibitors had been rejected. We note preliminarily that the Paramount Agreement was applicable only to those pictures included on the "split," and required: (1) that there be a bidding situation; (2) that all bids be rejected; and (3) that there be exclusive negotiation with either STANLEY WARNER or GOLDMAN.

The plaintiff's brief specifically cites thirteen pictures, twelve of which were licensed to GOLDMAN and one to STANLEY WARNER upon the rejection of all bids; of these pictures, four were licensed by PARAMOUNT, four by WARNER BROS., two by COLUMBIA, two by UNITED, one by METRO, and none by either TWENTIETH CENTURY or UNIVERSAL. The brief significantly makes no reference to twenty-seven pictures which were licensed to other exhibitors, including fifteen which were licensed to the plaintiff, notwithstanding their inclusion on the "split."

The product of TWENTIETH CENTURY was licensed picture by picture on a competitive bidding basis, except where no bids were submitted. Its product was not split between STANLEY WARNER and GOLDMAN, and was apparently made available to all interested exhibitors. There is no evidence that this defendant at any time rejected all bids and thereupon negotiated with any exhibitor. The record is devoid of evidence from which it can be inferred that TWENTIETH CENTURY was aware of the PARAMOUNT agreement, or, if aware of it, participated in the plan of distribution contemplated.

The plaintiff complains of but a single picture licensed to GOLDMAN by METRO. This picture was not on any split list, and the grant of the license was within the exclusive control of the producer. There is evidence that of the nine METRO pictures licensed to VIKING, six were listed on either the STANLEY WARNER or GOLDMAN side of the split.

The plaintiff contends that two pictures released by UNITED were licensed to GOLDMAN on the basis of exclusive negotiation upon the rejection of all bids. It appears from the testimony that one of these was licensed after UNITED attempted to negotiate with exhibitors in addition to GOLDMAN, and as to the other, the evidence is clearly deficient. There is evidence that of the eleven UNITED pictures licensed to VIKING, eight were listed on either the STANLEY WARNER or GOLDMAN side of the split.

There is a reference to three instances in which the pictures of WARNER BROS., were licensed to GOLDMAN on negotiated terms upon the rejection of all bids. There is testimony that WARNER BROS., did not attempt to negotiate with VIKING, but no testimony that it did not attempt to negotiate with other exhibitors. There is a reference to a fourth picture which was licensed to STANLEY WARNER, apparently without competitive bidding.

The two pictures of COLUMBIA were licensed to GOLDMAN on negotiated terms after all offers were rejected. These pictures were not on any split list. It therefore cannot be seriously argued that

they were licensed in conformity with the plan contemplated by the PARAMOUNT agreement. There is no evidence that the negotiations were exclusive. There is no evidence in the record that UNIVERSAL employed the split system as an integral part of its plan of distribution.

We have given close consideration to all of the evidence which might bear on the issue of general adherence to the Paramount Agreement. There is ample evidence that on many occasions the distributors acted in a manner directly contrary to its terms. The evidence as a whole fails completely to support the alleged uniform plan of distribution incorporating terms such as those embodied in the Paramount Agreement. We are of the opinion that a jury would not be justified in inferring that any distributor, other than PARAMOUNT, either knew of, acquiesced in, or adhered to the agreement.

### CIRCUMSTANTIAL EVIDENCE

The plaintiff points to certain additional conduct of the defendants as indicative of a conspiracy to restrain trade and eliminate the VIKING as a competitor. It is argued that this conduct alone is sufficient to make out a prima facie case of conspiracy, and further shows that the split system was illegally employed as a device to restrain trade. In essence, the charge is that the defendant distributors engaged in certain practices in order to deprive the plaintiff of a fair share of the market and to ensure to the defendant exhibitors a competitive advantage. The plaintiff introduced evidence relating to actions taken and decisions made by the distributors during the period of suit and urges that the circumstances attendant upon these actions and decisions would entitle a jury to infer the existence of a common understanding among all the defendants.

### REJECTION OF BIDS

The plaintiff charges that each of the distributors routinely rejected "superior" bids and offers submitted by the VIKING and thereupon allocated the pictures to the defendant exhibitors. To support the charge, plaintiff undertook to com-

pare certain of its bids and offers with those submitted by the defendants. This was accomplished by first ascertaining the gross receipts earned by an exhibitor defendant for a particular picture. It was then assumed the plaintiff would have achieved the same gross receipts had it been able to exhibit the picture. The plaintiff then applied the terms of its bid or offer to the figure thus determined. By this method plaintiff arrived at a figure intended to represent the film rental it would have earned had its bid or offer been accepted. This latter was then compared to the rental actually earned and paid by the theatre which exhibited the picture. The plaintiff recognized that in some instances the VIKING could not achieve the gross receipts achieved by the other theatres, particularly the larger ones, in the same period of time. In these instances it was assumed that additional playing time would enable the plaintiff to achieve any gross reached by any of the defendants' theatres.

The comparisons, thus arrived at, are said to show that the plaintiff's bids or offers for twenty-nine pictures, if accepted, would have earned for the distributors more film rental than was earned by the defendant exhibitors. On the basis of these comparisons, the plaintiff urges that it may be inferred that the distributors rejected its bids and offers with intent to injure the plaintiff, pursuant to a common scheme. In our opinion, the comparisons failed to support the inference urged.

The technique employed to arrive at the comparisons can be afforded but little legal significance. The assumption that the plaintiff was capable of achieving grosses comparable to those achieved by the defendant exhibitors was not supported by the record.[12] The admission that plaintiff required substantially more

playing time to achieve comparable grosses is not unimportant in an evaluation of the financial terms of competing bids. Nor is its importance lessened in an evaluation of the expenses of advertising and of the exploitation potential of a picture in an integrated national pattern of release. We note further that the comparison technique generally ignores such terms as the availability date and the length of playing time.

Another defect inherent in the comparison technique is its reliance upon a hindsight determination of the grossing power of films. As we have heretofore noted, the distributor, at the time the bids must be evaluated, is unable to predict accurately the degree of success which may be attained by a picture. The distributors deal with a product which does not have a readily ascertainable market value, and must of necessity rely on a certain amount of guesswork. The inevitability of wrong guesses can receive no greater attestation than the record in this case. We approach with no little trepidation the prospect of permitting a jury to draw the inference desired by the plaintiff on the patently insubstantial basis of the comparison technique employed here.

The comparisons relied upon were less than equivocal. It cannot be seriously contended that each of the comparisons supports the plaintiff's thesis. The record clearly discloses that fully eleven bids and offers of the plaintiff were in fact inferior.[13] There were five instances in which the differences in financial terms were so minimal as to be insignificant, and four in which the financial terms were admittedly comparable. There were only nine bids or offers which, on the basis of the comparison technique employed, were arguably superior. There were in this last group four bids submitted to WARNER BROS., in which the plaintiff of-

12. The plaintiff offered to prove the grossing potential of VIKING by evidence that "its box office receipts amounted to 2.52% of the total national film rental of all pictures played," and that "the average figure for all the defendant's theatres was 1.88%." Aside from its highly speculative nature, the evidence was

without probative value and was properly rejected.

13. Plaintiff originally claimed that bids on four additional pictures were superior but the claim was withdrawn at the trial, when it was demonstrated that the bids were clearly inferior.

fered a flat film rental, less house costs, for each week of exhibition. This type of bid, because of the requirement that the distributor bear the house costs for each week, points up the significance of the plaintiff's concession that it required more playing time to achieve comparable grosses. We note that in each instance WARNER BROS. licensed the picture on a percentage of gross receipts basis. Plaintiff's claim of superiority, therefore, rests on pure conjecture.

The plaintiff called as witnesses representatives of each of the defendant distributors. These representatives testified at length with respect to the consideration given to the plaintiff's bids and offers and the bases upon which they were rejected. This testimony made clear the difficulties involved in the evaluation process. It was readily admitted that in the administration of a competitive system mistakes could be made.

The difficulties inherent in the valuation of competitive bids and offers were recognized by the Supreme Court in United States v. Paramount Pictures, 334 U.S. 131, 163, 68 S.Ct. 915, 932, 92 L.Ed. 1260 (1948), wherein the Court stated:

> "The question as to who is the highest bidder involves the use of standards incapable of precise definition because the bids being compared contain different ingredients. Determining who is the most responsible bidder likewise cannot be reduced to a formula. The distributor's judgment of the character and integrity of a particular exhibitor might result in acceptance of a lower bid than others offered. Yet to prove that favoritism was shown would be well-nigh impossible, unless perhaps all the exhibitors in the country were given classifications of responsibility. If, indeed, the choice between bidders is not to be entrusted to the uncontrolled discretion of the distributors, some effort to standardize the factors involved in determining 'a reasonable return to the licensor' would seem necessary."

See also Brown v. Western Massachusetts Theatres, Inc., supra.

■ Because of the unsubstantial nature of the comparison technique employed and the equivocal results obtained by the application of that technique, we are of the opinion that it would be impermissible to allow a jury to draw the inference that the rejection of the plaintiff's bids resulted from an intent to discriminate. A jury is permitted to draw only those inferences of which the evidence is reasonably susceptible, and may not be permitted to resort to speculation. Therefore, we hold that the evidence was insufficient to support the claim that the distributors rejected superior bids of the plaintiff in furtherance of a common plan.

## RENTAL ADJUSTMENTS

■ There is testimony in the record that the plaintiff requested film rental adjustments on twenty-one pictures on which it allegedly sustained a loss, and was granted two adjustments by UNITED and one by METRO. The plaintiff offered to prove generally that the adjustments granted each of the defendant exhibitors were more numerous and larger in total amount. The proof was intended to show that as part of the conspiracy the defendant exhibitors were accorded preferential treatment.

The offer of proof identified the exhibitors allegedly favored but failed to indicate which of the distributors were guilty of the alleged discrimination. We are of the opinion that the offer of proof was properly rejected. The facts which the plaintiff offered to prove could have had no legal significance in the absence of additional evidence which would afford a reasonable basis of comparison between the adjustments granted the defendant exhibitors and those denied the VIKING. There is no such evidence in the record and none was offered.

It is difficult to perceive how either WARNER BROS., COLUMBIA or PARAMOUNT can be charged with the discriminatory denial of adjustments to the plaintiff. The VIKING exhibited no pictures of eith-

er WARNER BROS., or COLUMBIA, and only one of PARAMOUNT's. There was no request for an adjustment on the PARAMOUNT picture. There is nothing in the evidence nor the offer of proof to indicate that either METRO or UNITED granted film rental adjustments to any of the exhibitors except the plaintiff. It was the policy of TWENTIETH CENTURY to deny adjustments on pictures licensed on a competitive bidding basis. This policy cannot be regarded as discriminatory.

The only specific evidence relating to discriminatory adjustments was a schedule, from which it appears that UNIVERSAL granted adjustments on seven pictures played by GOLDMAN and on three played by STANLEY. The charge of discrimination leveled against UNIVERSAL is rebutted by the evidence that it offered the plaintiff an adjustment of fifteen thousand dollars on three pictures. This offer was withdrawn when UNIVERSAL learned of the plaintiff's intention to institute the present action. The plaintiff argues that the adjustment was offered on condition that the present action as to UNIVERSAL be withdrawn; the evidence in the record is to the contrary.

The plaintiff also complains of alleged discriminatory treatment in the adjustment of playing time. We have reviewed the record in the light of this complaint and find that there is no evidence to support it.

### EXCESSIVE PLAYING TIME

The plaintiff alleges that the defendant distributors "required" the VIKING to make extensive playing time commitments in order to license film. More particularly, it is claimed that the plaintiff was unable to license film unless it agreed to play them for "excessive" periods of time. It is argued that, as a result, the plaintiff experienced long periods of time in which it was unable to seek desirable films and was prevented from realizing an optimum return on the exhibition of pictures. The alleged requirement is said to have been discriminatory in that the defendant exhibitors were permitted to exhibit films for shorter periods of time.

The record in this case shows with clarity that playing time for pictures varied. It may be said that generally the playing time was longer for those pictures with the higher earning power. However, the record also shows that the playing time for pictures having comparable national film rentals varied considerably. Playing time for pictures with comparable grosses in the Philadelphia area varied as well.

The plaintiff's claim that its playing time commitments were "required," warrants consideration. At the time that bids or offers are solicited and submitted, neither the distributor nor the exhibitor can foretell with accuracy the most appropriate playing time to be afforded to particular films. It is evident that it was the practice of the distributors to refrain from advance indication of what they considered to be an acceptable playing time commitment. The exhibitors, therefore, assumed the initiative in the determination of playing time by the submission of proposals to the distributors. There is nothing in the record from which can be drawn any inference other than a uniform adherence to the described practice.

There is no evidence that any distributors indicated in any manner that it required plaintiff to submit bids or offers providing for any specific playing time. Nor is there any evidence that any distributor indicated to the plaintiff that the rejection of any bid or offer was the result of an inadequate playing time commitment. It is clear that the plaintiff was at liberty to offer whatever playing time it desired. The distributors could determine what playing time the plaintiff deemed to be reasonable only by consulting the terms offered. The notion that acceptance of those terms can be transformed into a "requirement" that they be offered is less than appealing. In sum, there is no little difficulty in plaintiff's assertion that it was "required" to make any particular commitments as to playing time. However, we shall consider the further argument that the defendant exhibitors were permitted to license film

for playing periods less than those granted to plaintiff.

We are of the opinion that the relevant evidence was legally insufficient to afford a valid basis for comparison. There is evidence in the record as to the length of time VIKING played each picture licensed to it. The evidence as to the length of time comparable pictures played theatres of the defendant exhibitors is negligible. What little evidence there is clearly indicates that pictures played by the defendant exhibitors, comparable to those played by the VIKING, were exhibited for both longer and shorter periods. The disparities were minimal and of no legal significance. There is nothing in the record, or in any offer of proof made by the plaintiff, from which the jury could have reasonably inferred that there was any discriminatory practice as to playing time.

## FILM RENTALS

It is charged that in furtherance of the conspiracy, the defendant distributors "required" the plaintiff to pay "excessive" film rentals. The term "excessive" implies an amount too great to be fair and reasonable. To support the charge, the plaintiff attempted a comparison of the film rental it paid with that paid by the defendant exhibitors. There is evidence in the record that during the entire period in suit the total film rental paid by the plaintiff was equal to 52% of its total gross receipts. There is further evidence in the record that the total film rental paid by all of the defendant exhibitors was equal to 40% of their total gross receipts.

In addition to this evidence, plaintiff "offered a comparison of the total film rental paid by each theatre for the pictures it played during the period of the suit as against the total national film rental on the same pictures." The offer of proof was intended to show that the plaintiff paid a higher proportion of national film rental on the pictures exhibited than did the theatres of the defendant exhibitors.

We have some difficulty in determining what inference could be drawn from either the evidence in the record or that offered by the plaintiff. The calculations are based upon a hindsight determination of the earning power of films exhibited, while licensing takes place before earning power, as reflected by gross receipts, can be determined. Therefore, the figures do not tend to reflect the rental terms which the parties to the license might foresee as being fair and reasonable. Moreover, the calculations provide no criteria determinative of "excessiveness."

We entertain serious doubt as to the probative value of the comparisons. The plaintiff's computation of gross film rental paid by it includes the total of six guarantees, each of which was considerably higher than the earned film rental. The reference is to the guarantees paid on pictures licensed by VIKING in the second year of its operations. Absent these guarantees, the comparisons are of little or no significance.

Whatever the comparisons are intended to show, there is no evidence from which it can be inferred that the plaintiff was "required" to offer excessive rental terms. There is likewise no evidence which would warrant a conclusion that the plaintiff was under any compulsion to offer guarantees which later proved to be excessive. The record is devoid of proof from which it can be inferred that any distributor was aware that the film rentals offered were deemed by the plaintiff to be unreasonable. The rental terms were voluntarily proposed by the plaintiff; the acceptance of those terms by the distributors would not permit an inference that plaintiff was required to offer them.

The above deficiencies in the evidence aside, there is no proof, direct or circumstantial, that there was a common understanding among distributors with respect to film rentals. There is no evidence from which it can be inferred that any distributor had knowledge of the film rentals charged by any other distributor. There is nothing in the evidence as a whole

from which a jury could reasonably conclude that the distributors conspired to exact excessive film rentals from the plaintiff.

### ADVERTISING ARRANGEMENTS

The plaintiff charges that "VIKING was subjected to discriminatory advertising arrangements." To support the charge, the plaintiff made two offers of proof, one of which related solely to a dispute with METRO. Whatever the merits of this dispute, it stemmed from isolated occcurrences unrelated to the conduct of any of the other defendants. This offer of proof was properly rejected.

The second offer of proof was intended to show that the "VIKING paid a substantially greater percentage of its gross receipts for advertising than the defendant exhibitors did." Absent some evidence as to the nature and amount of advertising these expenditures represent, the offered comparison of percentages would have been meaningless. The plaintiff offered no such evidence and the offer of proof was therefore properly rejected. Upon careful consideration of the evidence in the record, we find no basis for the plaintiff's charge of discrimination.

### BLOCK BOOKING

Plaintiff further alleges that it was required to license unwanted pictures in order to obtain those it desired. This allegation relates to four pictures licensed to VIKING by UNIVERSAL. The plaintiff does not claim that the incident in and of itself was illegal but argues that it is evidence of UNIVERSAL'S complicity in the alleged conspiracy. There is no evidence that UNIVERSAL'S conduct was motivated by any understanding with any other defendant. Nor is there evidence that the arrangement was part of a common scheme contemplated by the other distributors, or that they were even aware of it. The concert of action necessary to conspiracy was clearly absent.

### ADDITIONAL CHARGES

The plaintiff makes two additional charges against the defendant distributors: first, that VIKING, but not the defendant exhibitors, was required to submit written bids; and second, that VIKING was subjected to discriminatory law suits. We are of the opinion that these charges are so devoid of merit that they do not warrant discussion.

█ While our discussion has heretofore, and of necessity, been directed to the individual complaints of the plaintiff and the evidence relating thereto, we have been mindful of the propriety of viewing the evidence as an integrated whole and as it relates to the general allegation of conspiracy. As we have stated, the direct evidence adduced by the plaintiff falls far short of the minimum necessary to prove the existence of an unlawful agreement. In our view the circumstantial evidence also fails to meet the required minimum.

█ The gravamen of a civil action under the antitrust laws is conspiracy, the proof of which may rest, as it frequently does, on circumstantial evidence. The courts have recognized the difficulty inhering in an attempt to prove conspiratorial conduct by such evidence. The difficulty has resulted in some relaxation of the requirements of proof and resort to the doctrine of "conscious parallelism." However ameliorative the doctrine may be, it has not dispensed with the requisite that conspiracy be proved. Theatre Enterprises, Inc. v. Paramount, 346 U.S. 537, 74 S.Ct. 257, 98 L.Ed. 273 (1954); Delaware Valley Marine Sup. Co. v. American Tobacco Co., supra; Gold Fuel Service, Inc. v. Esso Standard Oil Co., 306 F.2d 61 (3rd Cir.1962), cert. den. 371 U.S. 951, 83 S.Ct. 506, 9 L.Ed.2d 500 (1963). In the application of the doctrine the courts have recognized that certain parallel behavior is inherent in many business settings. Therefore, it has been held that proof of a conspiracy may not rest on similarity of conduct in the absence of evidence that the alleged wrongdoers were mutually aware of such conduct and that the mutual awareness entered into their decisional processes. Ibid. See also Brown v. Western Massachusetts Theatres, Inc., supra.

While there is evidence that certain business practices of the defendant distributors were similar, there was not the substantial uniformity, in response to plaintiff's request for product, such as was present in three motion picture cases previously decided by this Court.[14] However, the weakness in the plaintiff's proof does not lie in this deficiency alone. The evidence, viewed in the light most favorable to the plaintiff, was clearly insufficient to warrant a reasonable inference that any defendant was aware of any other defendant's reaction to plaintiff's requests for product. Nor is there evidence, direct or circumstantial, that any defendant was cognizant of the terms and conditions upon which any other defendant licensed films to the VIKING. Absent such evidence, there was no basis upon which to draw an inference that the actions taken and the decisions made by the defendants were motivated by anything other than independent business judgment. Therefore, the direction of a verdict in favor of the defendants was proper.

### OFFER OF PROOF

The main argument of the plaintiff is that the rejection of the offers of proof placed an undue limitation on its attempt to prove conspiracy. We have heretofore considered each of the offers of proof and have determined that they were not of sufficient probative value to warrant the conclusions in support of which they were offered. This deficiency aside, the relevancy of the proffered evidence to the issue of conspiracy was, at best, tenuous. The plaintiff was afforded ample opportunity to inquire into the conduct of the defendants during the period in question. The inquiry was wide and produced a mass of evidence relating to the charged conspiratorial conduct. We are convinced, upon our review of the record, that the proffered evidence could have added little of significance to that already in the record. Therefore, the rejection of the offers of proof cannot be regarded as improper.

### PROOF OF DAMAGE

Since we have decided that the evidence as a whole was insufficient to sustain the charge of conspiracy, we see no reason to express an opinion as to the sufficiency of the proof as it relates to the issue of damages.

### PRETRIAL CONFERENCE

The trial of this action required 41 full days and produced a record, which is anything but orderly, consisting of more than 7000 pages of testimony and a large number of written exhibits. This voluminous record emphasizes the importance of the pretrial conference to the efficient trial of the protracted case. We are convinced that the trial time could have been shortened considerably with a concomitant reduction in the size of the record if the attorneys had made a conscientious effort to (1) stipulate matters in which there was no dispute; (2) specify the issues with particularity; and (3) formulate an efficient trial plan. The condition of the present record clearly indicates that there was no such effort here.

The key to the manageable trial, and essential to the maintenance of an orderly record, is a specification of issues with particularity. We recognize the reluctance of many lawyers to be specific less they thereby forego some advantage which might unexpectedly develop in the course of the trial. Whatever their objection, the necessity for specification of issues in the protracted case is so great

---

14. Milgram v. Loew's, Inc., 192 F.2d 579 (3rd Cir. 1951), cert. den. 343 U.S. 929, 72 S.Ct. 762, 96 L.Ed. 1339 (1952); Ball v. Paramount Pictures, Inc., 169 F.2d 317 (3rd Cir. 1948), cert. den. 339 U.S. 911, 70 S.Ct. 568, 94 L.Ed. 1337 (1950); William Goldman Theatres, Inc. v. Loew's, Inc., 150 F.2d 738 (3rd Cir. 1945), cert. den. 334 U.S. 811, 68 S.Ct. 1016, 92 L.Ed. 1742 (1948). There was in each of these cases, in addition to proof of parallelism, "a web of circumstantial evidence pointing very convincingly to the ultimate fact of agreement." Delaware Valley Marine Sup. Co. v. American Tobacco Co., supra, 297 F.2d at page 206, footnote 19.

as to require it. Absent such specification, the trial "cannot be confined to its proper limits, counsel are at a loss as to their positions, and the judge is unable to relate the evidence to issues which are in dispute or to limit it to that which is relevant." Prettyman Report, 13 F.R.D. at 66–67. We are of the view that it is not unreasonable to expect the attorneys to agree on matters as to which there is no dispute and to precisely define the triable issues.

The protracted case contributes to the congested calendar and consequently presents a major problem in those districts in which there is a concentration of this type of litigation. The solution to the problem lies in the effective, not the mere perfunctory, use of the pretrial procedures contemplated by Rule 16 of the Federal Rules of Civil Procedure, 28 U.S. C.A. The failure to use these procedures in the protracted case can only result in the waste of judicial manpower, a waste which the administration of judicial business can ill afford.

The judgment of the court below will be affirmed.

## APPENDIX A

| Theatre | Location | Owner | Floor | Balcony | Total |
|---|---|---|---|---|---|
| | | | *Seating Capacity* | | |
| Viking | 19th & Chestnut | Viking | 947 | 70 | 1017 |
| Goldman | 15th near Chestnut | Goldman | 988 | 200 | 1188 |
| Midtown | Chestnut near Broad | Goldman | 994 | None | 994 |
| Randolph | 12th & Chestnut | Goldman | 1366 | 654 | 2020 |
| Stanley | 19th & Market | Stanley Warner | 1450 | 1482 | 2932 |
| Mastbaum | 21st & Market | Stanley Warner | 2498 | 1889 | 4387 |
| Stanton | 16th & Market | Stanley Warner | 783 | 590 | 1373 |
| Fox | 16th & Market | Fox | 1333 | 1089 | 2422 |
| Translux | 16th & Chestnut | | 493 | None | 493 |
| Arcadia | 16th & Chestnut | | 650 | None | 650 |
| Studio | Market near 17th | | 400 | None | 400 |
| World | Market (in 1800 block) | | 499 | None | 499 |

NOTE: The ownership of the last four theatres is of no relevance.