**CINEMA–TEX ENTERPRISES, INC.**

v.

**SANTIKOS THEATERS, INC., et al.**

**Civ. A. No. SA 73 CA 197.**

United States District Court,
W. D. Texas,
San Antonio Division.

March 13, 1975.

James R. Warncke, San Antonio, Tex., for plaintiff.

Gilbert Lang Mathews, Lang, Cross, Ladon, Boldrick & Green, San Antonio, Tex., for defendants; Bernard Ladon, Gilbert Lang Mathews, San Antonio, Tex., of counsel.

## MEMORANDUM AND ORDER

CLARY, Senior District Judge.

The trial of this private antitrust action began February 24, 1975 and continued for six days. At the close of all the evidence and out of the presence of the jury argument was held on defendant's motion for a directed verdict. After extended argument, this motion was granted by the Court and the jury was instructed to find for the defendant. This Memorandum and Order has been prepared to set forth briefly the basis for the Court's decision.

Plaintiff, Cinema-Tex Enterprises, Inc., owned and operated a movie theatre located

in the Colonies North Shopping Center, San Antonio, Texas.[1] The theatre was in operation under plaintiff's management from February of 1970 until April of 1972. When originally formed in November of 1969, the corporation had three officers and stockholders: Thomas A. Reynolds, president; George H. Falk, secretary-treasurer; and John H. Goebel, executive vice president. From the outset, plaintiff hoped to exhibit first-run films in its theatre.[2] To obtain first-run pictures, plaintiff submitted bids for them in response to invitations to bid from distributors. This process of competitive bidding[3] was the distribution scheme in effect in the San Antonio area at the time of plaintiff's entry into the market, and through this method the films "The Out-of-Towners" and "Norwood" were obtained.[4]

The testimony indicated that about this same time, from the end of 1969 until the fall of 1970, exhibitors on the North Side of San Antonio[5] were becoming increasingly dissatisfied with the competitive bidding process and the large cash guarantees which the exhibitors were required to put up to get pictures. The defendant,[6] John Santikos, testified that in late 1969 the possibility of a "split"[7] among North Side exhibitors was proposed to him and that he attended the first meeting in Dallas in the fall of 1970. The meetings were held in the offices of ABC Interstate and representatives of the North Side exhibitors attended.[8]

There was some confusion as to how many and which meetings the plaintiff and defendant attended, but both voiced the same complaint. Neither was getting the number or quality films they desired. The first-run theatres in the strongest competitive position were the North Star Cinema I & II, the Fox, the Wonderland and the Broadway. These exhibitors were in a position to demand the best films from the split

1. Cinema-Tex Enterprises and its officers were also involved in other business activities during the period in question in this action. However, as these other activities bear only tangentially on points specifically at issue in this Memorandum they will not be discussed except to the extent immediately relevant.

2. First-run is a term used to describe a motion picture that is being exhibited for the first time in a particular area.

3. For purposes of this Memorandum, the intricacies of the bidding process with invitations, bids, rejections, re-bids and negotiations between the exhibitors and the distributors need not be explored in detail. While bidding was the usual practice, the division manager for United Artists testified that his company contacted the exhibitor with whom they wished to place their first run films and did not solicit bids for this product.

4. Plaintiff's president, Thomas Reynolds, testified to the need of the theatre to obtain quality films early in its life so as to get a "track record" with distributors and establish itself as a profit making enterprise.

5. In the San Antonio area, the distributors and exhibitors appeared to agree that the North Side and the South Side are not in competition and constitute two separate markets. Only the theatres on the North Side are involved in this action.

6. The named defendants in this action are Santikos Theatres, Inc. which operates several theatres in the San Antonio area, John Santikos, president of Santikos Theatres, and Mid-Loop, Inc. which owns the real estate of Santikos Theatres but operates no theatres itself. For convenience, the defendants will hereafter be referred to in the singular.

7. The split arrangement was not new in the motion picture industry, but this was the first time it was used in San Antonio. Instead of submitting bids and providing a cash guarantee to the distributors, the exhibitors would divide the first-run films among themselves. The exhibitor to whom a film was given would get the opportunity to negotiate the terms of its exhibition with the distributor without interference from others in the split. The final decision rested with the distributor, and the split could not guarantee that any exhibitor would finally be awarded a particular film by the distributor.

8. Representatives of ABC Interstate, General Cinema Corp., National General Corp., Cinema Arts, Aztec Theatre, Santikos Theatres and Cinema-Tex attended these meetings. Among this group were representatives of all the exhibitors on the North Side. Plaintiff had only one theatre, as did the defendant which operated the Olmos Theatre.

and both plaintiff and defendant appear to have gotten lost in the shuffle.

As described by Santikos, the exhibitors would gather at the meetings and divide the pictures from a list compiled by the booker for ABC Interstate. Although the actual mechanics of this distribution were not brought out, it appears that the larger and more established exhibitors would lay claim to particular films and thereby obtain the right to negotiate with the distributor without interference from the other exhibitors.

The distributors were not part of the split and continued to solicit bids which were ignored by the exhibitors. Individual exhibitors apparently could have brought about the end of the split at any time by responding to the invitations and bidding on films. The split continued at least into the summer of 1972. Reynolds testified that he attended a meeting in the fall of 1971 where he again failed to get a film. Reynolds stated he was receiving invitations to bid but did not respond because he feared reprisals from competitors or distributors. Equally dissatisfied with the results of the split, Santikos returned to competitive bidding and the split dissolved.

Unfortunately for plaintiff, by late 1971 and early 1972 its financial position had become untenable. The record is replete with evidence of undercapitalization, over-expansion and bad business judgment which combined to force plaintiff to sell its theatre in the late spring of 1972. The theatre was purchased by Santikos Theatres, Inc. and has been operated by the defendant since June 1972.

This case proceeded to trial on the plaintiff's amended complaint which alleged violation of Section 1 of the Sherman Act [9] and sought treble damages under Section 4 of the Clayton Act.[10]

■ To prevail in this action, plaintiff would need to prove that the defendants had violated Section 1 of the Sherman Act and that this violation was a material cause of injury to its business. *Rea v. Ford Motor Co.*, 497 F.2d 577 (3rd Cir.), *cert. denied*, 419 U.S. 868, 95 S.Ct. 126, 42 L.Ed.2d 106 (1974); *Morning Pioneer, Inc. v. Bismark Tribune Co.*, 493 F.2d 383 (8th Cir. *cert. denied*, 419 U.S. 836, 95 S.Ct. 64, 42 L.Ed.2d 63 (1974); *Martin v. Phillips Petroleum Co.*, 365 F.2d 629 (5th Cir.), *cert. denied*, 385 U.S. 991, 87 S.Ct. 600, 17 L.Ed.2d 451 (1966). At the close of all the evidence, this Court ruled that the activities of the defendant and other exhibitors constituted a *per se* violation of the antitrust laws, but that plaintiff had failed to introduce evidence to show that he had been damaged by such activity. These two rulings will be briefly discussed in order.

■ The evidence is uncontradicted that the North Side exhibitors entered into an agreement to "split" first-run movies among themselves and thereby do away with competitive bidding. While this procedure did not result in an automatic award of any particular picture, the final decision resting completely in the hands of the individual distributor, it permitted the recipient of the picture at the split meeting to negotiate with the distributor without interference by the other exhibitors. All the North Side exhibitors took part, but none of the distributors were involved. John Santikos, the individual defendant, testified that the purpose of the split arrangement was to avoid the cash guarantees which attended the bidding process. In response to a ques-

9. Section 1 of the Sherman Act provides in pertinent part:

Every contract, combination in form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal:

. . . . .

15 U.S.C.A. § 1 (1973).

10. Section 4 of the Clayton Act provides:

Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee.

15 U.S.C.A. § 15 (1973).

tion by the Court, he further stated that the participants in the split arrangement honored the split determinations and agreed not to compete for the product.

Defendant has argued that this case is governed by *Viking Theatre Corp. v. Paramount Film Distributing Corp.*, 320 F.2d 285 (3rd Cir. 1963), *aff'd per curiam*, 378 U.S. 123, 84 S.Ct. 1657, 12 L.Ed.2d 743 (1964), in which no violation of the law was found in a split agreement. After careful consideration, the Court is of the opinion that *Viking Theatre* is distinguishable from the present case. In *Viking Theatre*, the split agreement included both exhibitors and distributors. The agreement did not require the distributors to deal only with the exhibitors in the split or to include particular pictures in the group to be split. Moreover, all exhibitors could, and did, bid or negotiate for some or all of the pictures of each distributor and the distributors retained the right to solicit bids from any of the exhibitors.

In the present case, all the exhibitors took part in the split for the purpose of eliminating competition in obtaining films. Although each could have submitted bids for films, the evidence indicates that all upheld the split and refrained from competitive bidding. The distributor, therefore, could deal only with the exhibitor who was awarded the picture in the split unless negotiations with that exhibitor were non-productive and the distributor could solicit bids from other exhibitors. As the Ninth Circuit pointed out in *Dahl, Inc. v. Roy Cooper Co.*, 448 F.2d 17 (9th Cir. 1971), such an anticompetitive agreement would give rise to legitimate complaint by distributors.

In the opinion of the Court, a split arrangement such as revealed in the present case whereby all exhibitors in a given market agree to eliminate competition for films constitutes a *per se* violation of the antitrust laws. As this Circuit stated in *E. A. McQuade Tours, Inc. v. Consolidated Air Tour Manual Committee*, 467 F.2d 178 (5th Cir. 1972), *cert. denied*, 409 U.S. 1109, 93 S.Ct. 912, 34 L.Ed.2d 690 (1973):

In all of these cases, the touchstone of *per se* illegality has been the purpose and effect of the arrangement in question. Where exclusionary or coercive conduct has been present, the arrangements have been viewed as "naked restraints of trade," and have fallen victim to the *per se* rule. *Id.* at 187.

Having determined that a *per se* violation existed, the Court must now consider whether the plaintiff has suffered damage proximately caused by this violation. The evidence indicated that plaintiff willingly and voluntarily participated in the split arrangement. In spite of repeated written and oral solicitations from distributors, plaintiff submitted no bids for films. This practice of not responding continued even after the plaintiff became dissatisfied with the manner in which films were distributed at the meetings.

■ It is well established that a plaintiff cannot recover damages for failure to obtain first-run films unless a demand was made for the product which it now claims it was denied by the action of the defendant conspirators. *Royster Drive-In Theatres, Inc. v. American Broadcasting-Paramount Theatres, Inc.*, 268 F.2d 246 (2nd Cir.), *cert. denied*, 361 U.S. 885, 80 S.Ct. 156, 4 L.Ed.2d 121 (1959); *Webster Rosewood Corp. v. Schine Chain Theatres, Inc.*, 263 F.2d 533 (2nd Cir.), *cert. denied*, 360 U.S. 912, 79 S.Ct. 1296, 3 L.Ed.2d 1261 (1959); *Milwaukee Towne Corp. v. Lowe's, Inc.*, 190 F.2d 561 (7th Cir. 1951). Plaintiff also has no claim if its failure to obtain first-run films results from its own mistakes. *Dahl, Inc. v. Roy Cooper Co., supra.*

■ The plaintiff admitted that it submitted no bids to distributors while the split was on-going and made no attempt to withdraw from the split arrangement. This decision was attributed to fear of reprisals from larger competitors. Despite this contention, there was no testimony concerning any threat, pressure, action or inaction either direct or indirect against the plaintiff by the defendant or other competitors. Reynolds testified that fear of these amorphous reprisals kept Cinema-Tex within the

split, but was unable to mention a single element of substance on which his fears were based.

The Court has considered all the evidence carefully as well as the arguments of counsel and has been forced to the conclusion that plaintiff has not proven any damage from the operation of the split. Plaintiff made a deliberate and voluntary choice to join the split and to adhere to the decision not to respond to requests for bids. Plaintiff has shown no evidence of coercion by other split members. Having failed to show damage resulting from violation of the law, plaintiff as a matter of law cannot prevail in this action. Accordingly, judgment must be entered for the defendant.

There is one aspect of this case that has caused the Court much concern. The attorneys for the defendant, during the critical times involved in the closing down of plaintiff's theatre, represented not only all of the defendants but the solvent stockholder of plaintiff's corporation, namely Mr. Goebel. When this feature of the case was disclosed, senior counsel for defendant did his best to show absolute impartiality. The Court is not at all certain that he succeeded in the attempt. It is certainly a situation to be avoided in any event.