**VIKING THEATRE CORPORATION**
v.
**PARAMOUNT FILM DISTRIBUTING CORPORATION et al.**
**Civ. A. No. 28805.**

United States District Court
E. D. Pennsylvania.
Sept. 1, 1965.

Montgomery, McCracken, Walker & Rhoads, by Hugh G. Moulton, Philadelphia, Pa., Halperin, Shivitz, Scholer & Steingut, by David I. Shivitz, and Harry M. Pimstein, New York City, for plaintiff.

W. Bradley Ward, Philadelphia, Pa., for Paramount Film Distributing Corp., Columbia Pictures Corp., Universal Film Exchanges, Inc., United Artists Corp. and Metro-Goldwyn-Mayer, Inc.

Louis J. Goffman, Philadelphia, Pa., for Warner Bros. Pictures Distributing Corp., Stanley Warner Management Corp. and Stanley Co. of America.

Edwin P. Rome, Philadelphia, Pa., for William Goldman Theatres, Inc.

Ralph Earle, II, Philadelphia, Pa., and Charles F. Young, New York City, for Twentieth Century-Fox Film Corp. and Fox Philadelphia Building, Inc.

JOHN W. LORD, Jr., District Judge.

This is an action under the antitrust laws by plaintiff, Viking Theatre Corporation, against seven distributors of motion pictures and three exhibitors operating theatres in Philadelphia, alleging a conspiracy to deprive plaintiff of first-run motion pictures during the period November 13, 1956 to November 2, 1960.

The pleadings have been closed for some time. Although the case has been the subject of several calls of the docket, and three pre-trial conferences, no discovery has taken place. This opinion and order are concerned exclusively with a motion to dismiss which was filed by all defendants under the following circumstances.

After a review of the notes of testimony taken at three pre-trial conferences in this case, a study of the briefs submitted by the parties, and careful reading of the authorities cited therein, this Court filed an order on June 18, 1965, granting leave to defendants to file a motion to dismiss. All parties defendant thereupon joined in such motion, presently before the Court, which reads as follows:

Defendants move the Court to dismiss the action on the ground that plaintiff is precluded from maintaining it by the stipulation and commitment entered into at the pre-trial conference of August 21, 1963; and on the alternative ground that plaintiff has failed to prosecute the action.

That motion—duly filed, briefed and argued—is presently ripe for disposition. It will be granted on the grounds stated, in accordance with the findings of fact and conclusions of law which follow.

For reasons which will appear, it will be necessary from time to time to refer to an earlier case, Civil Action No. 21623 in this Court. Despite a slight difference in the parties defendant, both cases are captioned for practical purposes as Viking Theatre Corporation v. Paramount Film Distributing Corporation, et al., as above. Civil Action No. 21623, which was tried in 1961, has come to be known as Viking No. 1. The present Civil Action No. 28805 is called Viking No. 2. Comparing the two cases, one notes that

the allegations of the complaints are similar if not identical; the plaintiff is the same in both cases; and the parties defendant are almost the same. N.T. May 20, 1965, pp. 18, 19. The only significant difference is in the time periods during which the alleged wrongs occurred. That is, Viking No. 2 alleges a damage period which starts where that of No. 1 ended. Finding No. 12 infra.

The three pre-trial conferences in this case took place before the present Court and Judge and have been reported in full. To avoid repetition of the dates of those conferences, the respective notes of testimony will be indicated by Roman numeral designations to indicate which conference the notes refer to. That is, the hearing of August 21, 1963 (Doc. 18) will be designated "I"; that of May 20, 1965, is to be "II"; and the latest hearing, July 20, 1965, will be shown as "III". Thus, for example, the reference in the preceding paragraph would appear, under the designations as explained, as "II N.T. 18, 19".

At the third of those hearings, July 20, 1965, the history of those inevitably interrelated cases was recounted by a spokesman for defendants. Plaintiff disagreed with defendants' contentions as to the legal effect of the events recounted in that chronology. But even those vigorous denials did not challenge the accuracy of defendants' presentation of the factual sequences. For convenience, the Court will commence by adapting its findings from statements already in the record. III N.T. 5–32. Chronological order will be observed, insofar as possible.

## FINDINGS OF FACT

1. Viking No. 1 was begun on November 13, 1956. It was an action under the Sherman Act to recover treble damages for the period beginning when the theatre opened, July 2, 1954 down to November 13, 1956.

2. Viking No. 1 was tried from May 15, 1961 until July 19, 1961, and resulted in a directed verdict in favor of the defendants.

3. On June 21, 1963, approximately two years later, that judgment was affirmed. Viking Theatre Corp. v. Paramount Film Distributing Corp. et al., 320 F.2d 285 (3rd Cir. 1963).

4. Shortly thereafter, meeting No. 1 took place on August 21, 1963. The notice given by the Court, the responses of plaintiff to that notice, and the occurrences during that hearing—when plaintiff made what defendants call a "commitment"—are the gist of the present controversy. For that reason, all those matters will be covered in detail in later findings rather than in the present introductory listing of the order of events. I N.T. 5; III N.T. 5.

5. On September 19, 1963, a petition for certiorari in Viking No. 1 was filed in the Supreme Court of the United States. III N.T. 5.

6. On December 9, 1963, an order granting certiorari was handed down by the United States Supreme Court, captioned as above. 375 U.S. 939, 84 S.Ct. 347, 11 L.Ed.2d 270 (No. 481).

7. On June 15, 1964, the following order was filed by the United States Supreme Court:

PER CURIAM: The judgment is affirmed by an equally divided Court. Mr. Justice Douglas took no part in the decision of this case. 378 U.S. 123, 84 S.Ct. 1657, 12 L.Ed.2d 743.

8. On October 12, 1964, appellant's petition for rehearing was denied.

9. The complaint in the present case, Viking No. 2, was filed on November 3, 1960 (which was before the trial of Viking No. 1).

10. The complaint in Viking No. 2 covered a time period commencing immediately after the end of the damage period unsuccessfully asserted in Viking No. 1.

11. Specifically, the complaint, filed November 3, 1960 in Viking No. 2 said:

"The period for which damages are claimed in this action is November 13, 1956 to the date of filing the action."

12. In other respects, as defendants said at III N.T. 6:

"* * * concededly Viking No. 2 is identical in all its averments and in its basic cause of action with Viking No. 1, the only difference being that RKO-Teleradio Pictures was not included as a defendant in Vi-king No. 2 and there was an averment in Viking No. 2 that Fox Philadelphia Building had discontinued the operation of its theatre at 16th and Market Streets in August of 1959."

The following tabulation summarizes the foregoing dates and facts:

| Case | Date Commenced | Damage Period, From – To |
|------|----------------|--------------------------|
| Viking No. 1 | Nov. 13, 1956 | July 2, 1954 to Nov. 13, 1956 |
| Viking No. 2 | Nov. 3, 1960 | Nov. 13, 1956 to Nov. 3, 1960 |

13. Meanwhile, Viking No. 2 had been designated a protracted case on November 10, 1960.

14. On October 13, 1964, as a consequence of denial of rehearing, Viking No. 1 was terminated, since the plaintiff had lost the case in the trial court, and thereafter exhausted all conceivable appellate remedies. Finding No. 8, supra.

15. Meanwhile, Viking No. 2, filed November 3, 1960, had been on the docket for slightly less than four years, and had been assigned to this Court as a protracted case during virtually all of that time. Findings Nos. 9 and 13, supra.

16. Commencing in 1959, and almost down to the time of the filing of Viking No. 2, counsel and Court were occupied with pre-trial matters. That fact was not apparent to the Court of Appeals from the record with which it was presented on appeal, Viking Theatre Corp. v. Paramount Film Distributing Corp. et al., 320 F.2d 285, at 300–301 (3rd Cir. 1963), and requires clarification here. Formal orders filed by this Court in Viking No. 1, which resulted from the numerous pre-trial conferences therein, are as follows:

| No. | Date of Filing of Order | Pages |
|-----|-------------------------|-------|
| 1 | August 26, 1959 | 4 |
| 2 | December 2, 1959 | 1 |
| 3 | January 11, 1960 | 6 |
| 4 | February 26, 1960 | 16 |
| 5 | July 26, 1960 | 2 |
| 6 | September 1, 1960 | 3 |

A review of those orders discloses that they ordinarily set dates or deadlines for the completion of certain steps in the process of narrowing the issues for trial through discovery and other means. For that reason there can be no doubt of the conclusion that Viking No. 1 was kept active down to trial despite unforeseen interruptions such as that caused by a withdrawal and substitution of counsel for plaintiff. I N.T. 34; III N.T. 7.

17. A review of the first 14 docketed entries in Viking No. 2 shows that the pleadings were apparently closed on December 5, 1960—the last entry being the answer of William Goldman Theatres, Inc., filed on that date.

18. Document 15 is the notice of the Clerk of Court, dated December 5, 1962, warning all parties, under Local Rule 18, that

"The record in the above case indicates that no proceeding has been docketed therein for a period of more than two consecutive years. Unless the Court, upon written application filed within 30 days from the receipt of this notice, shall otherwise order, the action will be dismissed." * * *

19. On December 13, 1962, the responding letter of counsel for plaintiff was docketed as entry No. 16. It reads in part as follows:

"* * * please be advised that this case was placed on the trial list in December, 1960, and is await-

ing trial. The case has not been settled." * * *

20. Although the next-mentioned matter is merely a stenographic or typographical error in the report of the United States Court of Appeals opinion in Viking No. 1 as it appears in 320 F.2d 285, it must be noted to avoid later confusion. Following the caption "Viking Theatre Corporation * * * No. 13756," the following words and figures appear: "Submitted July 24, 1963 [sic]. Decided June 21, 1963." 320 F.2d 285. In fact, of course, the appeal was argued in July of 1962.

The next findings, taken from the Court's preliminary remarks at the hearing of August 21, 1963, are quoted directly from the notes thereof. I N.T. 3–8.

21. On August 21, 1963, a preliminary pre-trial conference was held in Viking No. 2, the present case, wherein this Court stated at the outset:

I have done nothing further in the second Viking case for the reason that I was awaiting the decision of the Circuit Court of Appeals in the first Viking case. * * * No. 21623.

That was a natural thing because if the Circuit Court had reversed we would have immediately retried it. * * * I N.T. 3.

22. As already stated in findings Nos. 2, 3 and elsewhere herein, the trial of Viking No. 1 in this Court ended July 19, 1961. The affirmance of the Court of Appeals for the Third Circuit was handed down on June 21, 1963. Thus the case was pending on appeal to the Court of Appeals, from the standpoint of this Court, for virtually two years.

23. The following statements, quoted from the same place, are reproduced as parts (1) to (13) inclusive of the present numbered finding:

(1) When that decision [320 F.2d 285] was received I requested the file in the second Viking case from the Clerk. For the first time I saw in the file Mr. Sawyer's letter of December 12, 1962,

addressed to the Clerk, and you apparently have received copies of it, but I will read it to refresh your recollection. [The letter, Document No. 16, excerpted in Finding No. 19 above, was read in full.] I N.T. 3, 4.

(2) I then wrote to Mr. Sawyer under date of July 10, 1963, giving all of you a copy, and stated, to refresh your recollection:

"Your letter of December 12, 1962, addressed to the Clerk of the Court in the above matter has been brought to my attention.

"There has been no discovery had in the matter at any time, according to the copy of the docket entries which I have received from the Clerk.

"The last entry (aside from the Clerk's Notice of Dismissal) was on December 12, 1960 when the case was listed for trial.

"In view of the decision of the Circuit Court of Appeals, is it your intention to proceed further with this case? If so, please advise me within the next several weeks at which time I will arrange a conference with all counsel to determine how we shall proceed with discovery by all counsel." I N.T. 5.

(3) I then received a letter from Mr. Sawyer dated July 17, 1963, with copies to all of the defendants, in which he replies to my letter of July 10th and he says:

"I am informed that my client intends to proceed with the above case (that is, the second Viking case) but also intends to seek a writ of certiorari with respect to Viking * * * [No. 1] * * * and therefore request that no action be required of it pending the disposition of the petition by the Supreme Court of the United States." I N.T. 5.

(4) I replied the next day, July 18, 1963, and I stated:

"As I read the letter, you propose to try the second case regardless of

the outcome of your petition for certiorari in the first case. I N.T. 5.

"I have reviewed the time required with discovery, trial and appeal in the first case. The docket indicates that the complaint was filed November 13, 1956. As you know the Circuit Court of Appeals filed its opinion June 21, 1963, over 6½ years from the filing of the complaint. Furthermore, the docket entries indicate over 5 pages of discovery, proceedings, objections, petitions, pre-trial orders and that the trial, although scheduled for October, 1960, did not commence until May, 1961.

"The docket entries indicate further that in the second case the complaint was filed November 3, 1960, approximately 2½ years ago. I am assuming that the same procedure is indicated with respect to proceedings and discovery as occurred in the first case. In view of the size of the record, it is very uncertain as to when the Supreme Court of the United States will act."

The Circuit Court of Appeals said the record consisted of 7,000 pages and I have a memorandum here that there were 75 paper-bound volumes of transcripts and notes of testimony, 14 paper-backed volumes of appellate briefs and appendices. I N.T. 6.

Then I said, "Assuming a new trial is directed, we can immediately arrange for such an event." I N.T. 7.

In other words, we have to wait for the decision of the Supreme Court on the certiorari, and even if they grant the certiorari we don't know what the result will be on argument and appeal and whether the Circuit Court will be reversed or affirmed, so that it would be maybe two, three, or four years from now. I N.T. 7.

My letter continues: "On the other hand, if the opinion of the Circuit Court of Appeals is affirmed, we should have advanced toward the trial date in the second case. Un-

der these circumstances I direct all counsel to be in my chambers on Wednesday, August 21, 1963 at 10:00 o'clock A.M. for a preliminary pre-trial conference in order to *determine what discovery is intended and when it shall be completed with* [*sic*] *both sides*." I N.T. 7. (Italics added)

(5) In response to my letter dated July 18, 1963, Mr. Sawyer wrote me under date of August 7, 1963 as follows: he said that he had in hand my letter directing all counsel to be here on Wednesday, August 21st, today.

"I have had some further discussion about this case with Edward Bennett Williams, Esquire, of Washington, D. C. and his associates, who are now representing the plaintiff and who are preparing the appeal to the Supreme Court. *I am authorized to state that if the Supreme Court does not grant certiorari my client would not feel that he has sufficient grounds to proceed with the above case unless new evidence, hitherto unknown to us, were to come to light*." I N.T. 8. (Italics added)

(6) Mr. Sawyer's letter concluded with the following:

" * * * Naturally, we will take such steps or attend such pre-trial proceedings as Your Honor directs * * * I venture to suggest, however, that in view of the crowded calendar of yourself and the large number of counsel involved, that a pre-trial conference to determine what discovery is intended would not serve a useful purpose at this time." I N.T. 8.

(7) The next remarks were: [THE COURT, continued] Then I responded that I noted his present decision not to try the second case in the event that certiorari is denied by the Supreme Court. However, I said it would not affect the preliminary pre-trial hearing set in my chambers for today.

Now shall I direct my inquiry to Mr. Ungar or Mr. Steinberg [Mr. Sawyer's associate]? In my letter I said, You should also be prepared to have authorization from your client (at this time, now) to make of record a statement as to your intentions in the second Viking case including a statement as to whether any new evidence had been brought to your attention up to the time of the hearing (today).

Now do I ask Mr. Ungar or do I ask Mr. Steinberg? I N.T. 9.

(8) MR. UNGAR: [In response to the question stated in the paragraph immediately preceding] You will get the same answer from both of us * * *  We have received *no new evidence* and, as a matter of fact, we ought to supplement the statement that Mr. Sawyer made because it would have to be supplemented, that if we did discover new evidence there would be a considerable burden upon us to show that we could not with reasonable diligence have discovered it earlier. * * * Quite frankly, we don't want to foreclose ourselves from the chance of going forward with the case if some cataclysmic piece of new evidence that we have never heard of before should come to our attention. I N.T. 11.

(9) Thereafter counsel and court discussed the statistical possibilities of the grant of certiorari, the probable time lapse until decision, and the Court said:

Mr. Ungar, if you are informed as to *any additional evidence* I want you to let me know. I don't know whether I shall ask you to disclose it. I probably won't, but I shall, in all probability, set up another pretrial conference—[establishing deadlines for depositions, interrogatories, and so on.]

(10) This phase of the colloquy concluded with the following:

MR. UNGAR: But we just don't want to go into a rather complicated discovery procedure *in a case where, as likely as not, it won't be necessary.* * * * (Italics added)

THE COURT: In the meantime, your decision still stands that under the present state of facts as they exist today you do not intend to try the second Viking case.

MR. UNGAR: That's exactly right. *That's a commitment so far as we are concerned.* I N.T. 12. (Italics added)

(11) One of the defendants suggested that " * * * our position could well be that the issues in the second case are covered ,,and precluded from further consideration by the issues in the first case," to which suggestion the following reply was made:

MR. UNGAR: I suggest, Your Honor, that is an academic question because of our recognition that as a practical matter that is true; and that's why if the Supreme Court denies cert and we have nothing new we are going to drop the case. I N.T. 14–15.

(12) Thereafter statements were made by several defendants consistent with the following (which went unchallenged):

MR. WARD: * * * my view is that the determination of Viking No. 1 effectively terminates all of this litigation * * * until [certiorari] is disposed of I think it is difficult, if not impossible, to formulate any kind of timetable which we can all intelligently follow with respect to Viking No. 2 *if there should be a reversal.* * * * I N.T. 16. (Italics added)

(13) This particular phase of the conference closed with the following statement:

THE COURT: * * * then, gentlemen, I will do nothing further in the case and the record will indicate that there is no delay so far as not proceeding with a protracted case and that you are all in agreement.

I think it has been made very plain on the record that would be the only sensible thing to do; otherwise all of this discovery procedure would

be meaningless under the circumstances if the judgment of the *Circuit Court of Appeals is affirmed.* I N.T. 17. (Italics added)

24. From the foregoing facts and others contained or incorporated in the record of the first or preliminary pre-trial conference, this Court finds that the term "certiorari granted" was taken and understood by the Court and counsel for both sides on that occasion, and in the correspondence mentioned therein, to mean *"successful grant of certiorari"* or *"reversal of the Circuit Court of Appeals."* I N.T. 18, 21, etc.

25. In reaching the preceding Finding No. 24, it is noted that the following assumptions, tacit or otherwise, were present in the written and oral exchanges between Court and counsel—with nothing to the contrary being indicated at any time. First: that the statistical odds are very great against the likelihood that any given petition for certiorari will result in the grant of such review. Second: that the chances of any petitioner's eventual success before the Supreme Court of the United States are immeasurably improved once the prerequisite of acceptance of the petition for review ("grant of certiorari" in the literal sense) has been met. Finding No. 23 and the Notes of Testimony of the first hearing generally.

26. There was a circumstance which reinforces and explains the particularity with which counsel were required to make commitments concerning prosecution of Viking No. 2. In affirming Viking No. 1, the opinion of the United States Court of Appeals had been critical of the state of the record, and voiced certain strictures as to the absolute necessity of pre-trial in protracted cases. 320 F.2d 285 at 300–301. This Court was in a quandary. It did not then know whether Viking No. 1, as presented to the Court of Appeals, disclosed the voluminous pre-trial proceedings which resulted in the orders heretofore listed in Finding No. 16 supra. If the record on appeal had contained those orders, and such had been weighed and found wanting by the reviewing court, it was even more essential that the pre-trial of the second Viking case be made precise and complete. I N.T. 22–50. Particular note was made of the desirability of stipulations. I N.T. 30–36. Comment of counsel to the effect that the pre-trial orders in Viking No. 1 had not been made part of the printed record (appendices) on appeal was noted in the minutes of that conference. I N.T. 40.

27. In the chronology of the docket entries, the next occurrence of significance there shown is the allowance, on December 28, 1964, of the motion for withdrawal of appearances as counsel for plaintiff, in Viking No. 2, of Drinker, Biddle & Reath, by Henry Sawyer, III, Esq., and Williams, Wadden & Stein, by Edward Bennett Williams, Esq., and Harold Ungar, Esq. Doc. 19. Attached to the Order of Thomas J. Clary, Chief Judge, granting that motion is the joint motion itself which contains among other things the following recitals.

(1) and (2). That although the complaint had been signed by Henry W. Sawyer, III, Esq., Mr. Sawyer had been supplanted as active counsel by Williams, Waddell & Stein thereafter, and remained in the case thereafter solely as local counsel of record.

(3) and (4). That disagreements had arisen between plaintiff and two law firms who had represented him, and that they had been discharged.

(5). That at a special call of this case, December 21, 1964, plaintiff had secured an extension of 3 months in which to secure new counsel.

28. Document 20 represents the reporter's transcript of the special call to which reference has already been made, Hon. Thomas J. Clary, Ch. J., and Hon. C. William Kraft, Jr., J., presiding. Finding 27(5). Relevant to the present motion are the following remarks by Harold Ungar, Esq., who was introduced by R. Philip Steinberg, Esq., (associate of Henry Sawyer, Esq., who tacitly joined

in the statement from which the following is quoted):

MR. UNGAR: * * * I appeared on behalf of the plaintiff at the pre-trial a year ago last August; that is August of 1963. At that time I made a commitment to Judge John Lord that if the case then pending on petition for certiorari in the Supreme Court resulted in a denial of certiorari, the plaintiff would not proceed with the second case, would voluntarily dismiss it. The Supreme Court granted certiorari, and after argument the case was affirmed by an evenly divided court, Mr. Justice Douglas abstaining. [Finding No. 7, supra.] Mr. Williams and I took the position that while the letter of our commitment had not been exacted from us, we felt the spirit of our commitment was that the second case was to be dropped.

In any event, we discussed this with Mr. Sley and gave him certain advice with respect to the second case, which he elected not to take. We desire, therefore, to be relieved of our representation of the Viking Theatre Corporation. N.T. Special Call, 12/21/64 page 4.

29. Mr. Harry Sley, President of Viking Theatre Corporation, plaintiff, appeared in *propria persona* and made statements which for the most part are covered in the briefs and arguments of present counsel for plaintiff. In essence they deny authorization of (former) counsel to make any stipulation, and also insist upon a literal reading of the disputed term "certiorari granted". N.T. Special Call, supra.

30. Document 21, filed April 1, 1965 enters the appearance of Messrs. Shivitz and Pimstein, of New York, per local counsel, as counsel for plaintiff.

31. Document No. 22 is the order of Hon. Thomas J. Clary, Chief Judge, reading as follows:

"AND NOW, to wit, this 6th day of April, 1965, the above-entitled action (a protracted case) is assigned to the Honorable John W. Lord, Jr., Judge of this Court, for initial pre-trial only."

32. Occurrences thereafter were noted at the outset of this opinion, but are now listed here as findings for the sake of completeness:

(1) The hearing, designated as II, listed as initial pre-trial conference, took place on May 20, 1965. All parties were represented by counsel. In addition, statements for the record were made by Messrs. Sawyer, Steinberg and Ungar as former counsel for plaintiff. At the Court's request, Gustave F. Straub, Esq., personal counsel for Harry Sley, President of Viking Theatres, Inc., appeared and gave testimony.

(2) On June 18, 1965, this Court's order was filed, granting leave to defendants to file a motion to dismiss (as described on page 1 of this opinion).

(3) June 25, 1965, Defendant's Motion to Dismiss was docketed as Doc. 25—being the motion presently before this Court.

(4) A hearing, designated "Argument in re Defendants' Motion to Dismiss" was conducted on July 20, 1965.

(5) Since plaintiff's reply brief had not been handed up until the conclusion of argument on July 20, 1965, defendants were granted additional time for rejoinder. They wrote on July 26, 1965, that they elected to stand on their prior briefs.

(6) All briefs having been received, argument was deemed closed.

(7) The notes of the argument were transcribed by the reporter, submitted to the interested parties, and after amendment with respect to certain details, filed in final form on July 28, 1965.

(8) Nothing further remaining to be done before ruling, as already indicated at the beginning of this opinion, the Court now proceeds to

decision on the record (see Findings supra) as well as the briefs and arguments of counsel.

## DISCUSSION

The Conclusions of Law which follow this section would appear unduly abrupt if not prefaced by this discussion of the contentions and authorities of the parties.

The gist of plaintiff's position is that:

"In order to prevail on the present motion, defendants have the burden of establishing that further prosecution of the present action is barred by the statements made by former counsel at the pre-trial conference held on August 21, 1963, and that former counsel was authorized by plaintiff to make the statements there made. Defendants have failed to meet that burden [in that]

"I. Defendants have failed to establish that the statements made by counsel bar further prosecution of the second case;

"II. Defendants have failed to establish that plaintiff authorized counsel to drop the second case in the event the first case was affirmed."

As to the asserted lack of authorization of counsel, there was testimony at the December 21, 1964 hearing, as heretofore noted in Findings 28 and 29. The matter was the subject of testimony at the "initial" pre-trial in May of 1965. II N.T. 14, 17 and elsewhere, culminating in the testimony of Gustave F. Straub, Esq., N.T. 47–55. The latter had not been mentioned in proceedings until that hearing. Mr. Sawyer then said, referring to his letter of August 7, 1963: "I am authorized to state that if the Supreme Court does not grant certiorari my client * * * would not * * * proceed." Finding 23(5):

My best recollection, Your Honor, is that I did not talk directly with Mr. Sley on that point and that I talked to or consulted with Mr. Sley's personal attorney, a Mr. Straub. II N.T. 30.

Seeking to recount the exact train of circumstances, Mr. Sawyer stated that " * * * Mr. Straub conferred with me and he was the one who authorized me to take this position." II N.T. 32.

After further attempts to clarify these occurrences, Mr. Straub himself was— at the Court's request—brought into the courtroom. The Court thanked him at the time, and takes the present occasion to again express its gratitude for his courteous performance of his duty as an officer of the court. His testimony was given under circumstances of excruciating embarrassment, best indicated by the following question and answer. II N.T. 54.

THE COURT: And you then I understand are [Mr. Sley's] personal attorney?

ANSWER: That is right, that is right. I was. I don't know what I am now.

Numerous questions were asked of him; he answered all with fairness and candor. Through his cooperation the Court was saved much time in its efforts to understand the complicated circumstances which are the subject-matter of these findings of fact.

It should be noted that none of Mr. Straub's testimony has been incorporated into any of the foregoing findings. In compliance with the lawyer's obligation as an officer of court, he aided the Court in its understanding of a complicated situation. Nothing he said was against his client's interest, and none of his answers influenced the Court in deciding as it has. On that basis, and purely by way of clarification, it is mentioned that the following statement by Mr. Straub appears in the notes. II N.T. 49. The Court had asked him if he had received a copy of the Court's letter of July 18, 1963 to Mr. Sawyer, giving notice of the preliminary pre-trial conference scheduled for August 21, 1963. Finding No. 23(4). Mr. Straub stated that he had received it, and had sent a copy of that same letter to Mr. Edward Bennett Williams. Then, in answer to the Court's inquiry: "Did

you talk to Mr. Sley about it?" he replied:

"During that period, yes, at some time or other, I think I finally reached him out of town somewhere, either in 'Frisco or I think in Hawaii. He was then on the road. * * * I explained to him that there was to be this pre-trial conference and that I had talked with Mr. Williams about it * * * and I explained to him that the Court was insisting upon something being done at this pre-trial conference and that the best that I could get from Mr. Williams was that if he didn't get certiorari to the Supreme Court or new evidence that he would so have to advise the Court that he would not proceed with the second suit. * * * If he did not get certiorari—now that's the way I understood it at all times and that's what I explained to Mr. Sley.

"He, of course, was very unhappy about it and that's about the best thing that I can say to you."

■ After careful review of all the foregoing, and other statements and correspondence in the record, the Court is persuaded that counsel for plaintiff—Messrs. Williams, Ungar, Sawyer and Steinberg, at the times and places in question at least had ostensible, if not actual authority, to make the commitments in question.

■ Before considering the effect of ostensible authority, it is well to discuss the effect of such statements in the light of plaintiff's first contention that the statements made by counsel do not bar further prosecution of the second case. The Court is convinced that the effect of such statements is a matter for the Court's construction. In a sense that interpretation is likewise a matter of discretion. Winckler & Smith Citrus Products Co. v. Sunkist Growers, Inc., 346 F.2d 1012 (9th Cir., June 4, 1965). That is to say, this Court, having been concerned with the issues in these cases for almost 9 years, is in a coign of vantage which permits evaluation of the circumstances which defendants claim to work an absolute bar or, at least, an estoppel, to prosecution of Viking No. 2. For parts of those 9 years the Court was occupied exclusively with Viking No. 1, and for certain of the periods covered in the foregoing 32 findings, its attention was directly concentrated on the present case. On that basis, therefore, the Court believes that interpretation of the statements of counsel is not a matter of the application of strict law, but depends upon principles analogous to those of estoppel. In that light, therefore, the Court construes the statements of counsel to foreclose further proceedings. In so deciding, the Court relies upon the following

## CONCLUSIONS OF LAW

1. There is no difference in legal effect, in the present context, between the Supreme Court granting certiorari, having argument, and then, by a divided Court, affirming the decision of the Circuit Court of Appeals and the Supreme Court refusing certiorari in the first instance. II N.T. 50.

2. Although the statements of counsel referred almost exclusively to discontinuance of Viking No. 2 if certiorari was denied in Viking No. 1, the effect of those statements was to cause the Court to allow Viking No. 2 to remain on the docket although otherwise subject to dismissal for lack of prosecution.

3. The final result in Viking No. 1 is no different in its bearing on Viking No. 2 than if certiorari had been denied, and Viking No. 1 terminated at the stage of petition for certiorari, instead of—as it turned out—being terminated after a hearing before the Supreme Court.

4. Counsel had authority to make the statements in question which induced this Court to permit Viking No. 2 to remain on the docket without prosecution for several years after it became subject to dismissal under Local Rule 18.

5. Plaintiff will not be heard to deny the actual authority of counsel to make such statements. It is axiomatic that the

effectiveness of the pre-trial system depends upon counsel's authority to take the necessary steps toward stipulation, simplification of the issues, and the like in accordance with Rule 16, Fed.R.Civ.P.

6. Counsel had been put on notice, moreover, that it was necessary for them to have authorization on the particular point in question. Finding 23(7). Counsel represented to the Court in writing that it was so authorized. At no time was there any indication of inadvertence. Thus the Court had ample warrant for reasonably believing that the statements made were indeed the authorized statements of plaintiff.

■ 7. The Court's directions and instructions, reported fully in I and II N.T., are pre-trial orders and accordingly control the subsequent course of the action. Rule 16, Fed.R.Civ.P.; Sens v. B. & O. R. Co., 149 F.Supp. 440, 443 (W.D.Pa.1957); Fanchon & Marco, Inc. v. Paramount Pictures Inc., 133 F.Supp. 839, 841 (S.D.N.Y.1955).

8. Cases and authorities cited by present counsel for plaintiff, insofar as argued to have any controlling effect in support of plaintiff's present contentions, have been found not applicable, as indicated hereafter.

■ 9. The plaintiff is bound by counsel's statements and stipulations at the pre-trial hearings. Rule 16, Fed.R.Civ.P.; Sens v. B. & O. R. Co., 149 F. Supp. 440, 443 (W.D.Pa.1957); Wood v. National Farmers Union Automobile & Cas. Co., 114 F.Supp. 514, 521 (D.Colo. 1953); Geopulos v. Mandes, 35 F.Supp. 276 (D.C.1941), cases collected at 277.

10. Defendants are entitled to dismissal of the complaint in Viking No. 2 in accordance with their motion, under Rule 41(b), Fed.R.Civ.P.

### FINAL COMMENTS

Defendants have argued that the present situation is reminiscent of Lipp v. National Screen Service Corporation, 188 F.Supp. 245 (E.D.Pa.1960), aff'd. 3 Cir., 290 F.2d 321, cert. den. 368 U.S. 835, 82 S.Ct. 61, 7 L.Ed.2d 36. That result, say defendants, is authority for the contention that the Court has power to dismiss the case, and that plaintiff here is bound by the commitment of counsel.

The similarities are indeed striking, and the case is believed to be the most applicable to the instant problem of any discussed. The Court there was faced with seven actions brought after the commencement of a related suit, the Lawlor case (Lawlor v. National Screen Service Corporation, 3 Cir., 270 F.2d 146, cert. den. 362 U.S. 922, 80 S.Ct. 676, 4 L.Ed.2d 742). Of these seven, six were started soon after Lawlor and represented the claims of different plaintiffs directed to the same alleged violations of the anti-trust laws being charged in the Lawlor case. The seventh action was exactly the same kind of case as the second Viking action: it sought to bring up to date the claims of all the plaintiffs (Lawlor and the six others) for damages resulting from continuation of the same alleged conspiracy.

With respect to the six cases a rather formal stipulation was entered into whereby the decision as to conspiracy and monopoly in Lawlor would determine the issue for all cases—at least if it was in favor of defendants.

The seventh, the "follow up" case, was not included in this stipulation. When the seventh case was subsequently called to the attention of the Court, counsel for plaintiff made a statement as to the "practical" aspects of the situation very similar to that of Mr. Ungar in the present case.

"Mr. Anderson: * * * as a practical matter, that suit being merely supplemental to this suit, as Mr. Mullinix says, and Mr. Ward, it simply carries on, it simply brings the other case down to date. And, certainly, if, as we have assumed, for instance, that the Court finds that there is no liability here, no violation of the Sherman Act, this second suit will certainly be dead when its parent dies." 188 F.Supp. 245, 247.

In reply counsel for defendants stated:

"Mr. Nizer: * * * I agree with Mr. Ward and Mr. Anderson that

when Your Honor has disposed of this matter this will fall into place in some way for quick disposition." (Ibid.)

From this exchange, far less explicit than the discussions in the present Viking case, Judge Kraft had no difficulty in ruling that "It was agreed, after some discussion, that no *express* stipulation respecting [the seventh case] was necessary." (Ibid., emphasis supplied). Consequently the subsequent suit in the Lipp case was held barred, along with the others, by the adverse decision in Lawlor.

Counsel's words in the Lipp case, read literally, are merely a statement of opinion as to the practical effect of the decision in the first case on the course of the second. In *context*, however, they represented a *commitment*, and that commitment was fully and realistically enforced.

It is worth noting that Mr. Lipp and his five coplaintiffs each had to give up both his first case and his second case because of the result in the Lawlor case. The barring of the second Viking case represents a lesser forfeiture on at least equally strong a basis, since plaintiff here *has* had his *own* day in Court.

Main Line Theatres, Inc. v. Paramount Film Distributing Corp., 298 F.2d 801 (3rd Cir. 1962), cert. den. 370 U.S. 939, 82 S.Ct. 1585, 8 L.Ed.2d 807, is also vividly illustrative of the essential principle involved in determining the scope of a commitment in the context of its plain purpose and the surrounding circumstances. There had been a settlement agreement reached which dealt expressly only with money damages, but the suit had also involved a claim for injunctive relief. Judge Hastie stated, 298 F.2d at 803:

"In such circumstances a reasonable person agreeing, without any expression of limitation, to accept a sum in settlement of the litigation should and reasonably would understand that both aspects of the suit were covered by the settlement. Certainly, a defendant offering a sum in settlement of a suit asking, among other things, for an injunction against certain conduct, would not understand that a similar demand could be asserted the day after settlement. *This reasonable understanding determines the meaning of the assent expressed by the parties here."* (Italics added)

The foregoing cases, both decided in this Circuit and District, are deemed ample authority for the present order of dismissal.

■ Plaintiff, however, insists that the agreement is subject to strict construction, in accordance with certain cases to be discussed below. Construing the words in question, however, with the literalism for which plaintiff argues would be an unwarranted reversion to principles of *strictissimi juris*. The only reasonable understanding, shared by all concerned, was that the second case would be dismissed if the first was disposed of adversely to plaintiff. To make the result turn on the literal application of the jargon of "certiorari granted"—regardless of the futility of the issuance of such order—would be to revert to primitive law. Complicated litigation under modern remedial laws such as the antitrust statutes cannot turn on a matter of the choice of two words as though subject to the formulary pleading principles of early Roman law.

Defendants have pointed out that in the alternative, if the case is not dismissed in enforcement of plaintiff's commitment, it should be dismissed for failure to prosecute. They say:

Plaintiff's sole basis for avoiding the impact of counsel's commitment is the claim that it could be brought into play only by a denial of certiorari. If this were so, plaintiff was free to proceed—knew it had the right and obligation to proceed— on December 9, 1963, when certiorari was granted. Yet more than a year passed before any notice was given to the Court that plaintiff had any intention of pursuing the cause. This inaction was not only a violation of the Court's instructions [I N.T. 11, 17], but of Local

Rule 12. Moreover, it occurred during the fourth year of a case which everyone understood would require prolonged pretrial efforts, in which no steps had been taken, and which had already been subject to a Clerk's notice of dismissal pursuant to Local Rule 18. Thus, it is well within the discretion of the Court to dismiss for failure to prosecute, and the total situation calls strongly for the exercise of that discretion. Link v. Wabash Railroad Company, 370 U.S. 626, 82 S.Ct. 1386, 8 L.Ed.2d 734 (1962); Ordnance Gauge Co. v. Jacquard Knitting Machine Co., 265 F.2d 189 (3rd Cir. 1959); Choy v. Butler's, Inc., 304 F.2d 524 (9th Cir. 1962).

This dismissal, however, will not be allowed to rest upon the harsh ground of want of prosecution. Had there been no agreement to abide by the fate of Viking No. 1, of course, Viking No. 2 would long since have been dropped automatically under Rule 18. But, as heretofore found, plaintiff did enter into an agreement. And plaintiff's characterization of that agreement simply cannot be accepted. It seems at least disingenuous to insist, in this context, that "certiorari denied" meant, literally and regardless of eventualities, simply that and nothing more. Plaintiff's own inaction after the grant of certiorari alone shows that it contemplated affirmance or reversal of the Court of Appeals, rather than the mere technical grant of certiorari. On the other hand, had this Court been persuaded that the grant of certiorari alone, regardless of the ultimate result in Viking No. 1, was in plaintiff's mind— then indeed there would have been a serious question as to want of prosecution.

Plaintiff was forced to a decision. If colloquial characterizations will assist clarity, it found itself over the barrel of having to go ahead with what might well be a case it was not ready to try, or being required to stipulate. Finding 28 e. g. Plaintiff cannot rely on the exact wording of such agreement on the one hand,

deny all authorization on the other, and at the same time explain its failure to prosecute Viking No. 2 once certiorari had been granted in Viking No. 1. The cake which plaintiff now wishes to enjoy has already been eaten.

In a case of this magnitude, however, both parties are entitled to consideration on every possible point and contention. Thus, although it has been concluded that plaintiff's authorities are inapplicable, it is entitled to know how that result was reached. Conclusion No. 8.

Several cases are cited by plaintiff for the proposition that a stipulation as to conduct of a case cannot be construed as a stipulation of dismissal in the absence of an unequivocal statement that the parties so intended. They are:

United States v. MacEvoy, 10 F.R.D. 323, 327 (D.N.J.1950). In a civil action for damages under the False Claims Act, the parties had agreed—in effect—to hold up the action until the pending, concurrent criminal prosecution resulting from the same transactions had been disposed of. Quite understandably, the Court refused to construe the foregoing beyond its terms. The civil action was allowed reinstatement over a plea of the bar of statute of limitations, since no new cause of action was asserted in the later complaint. To summarize the case is to demonstrate its inapplicability.

Henry Hanger & Display Fixture Corp. of America v. Sel-O-Rak Corp., 270 F.2d 635, 639 (5th Cir. 1959). In this action for infringement of design patent and for unfair competition, there had been a preliminary hearing before a Special Master. The record of that hearing showed both parties to have assented to a statement by the Master that "this new slant rack doesn't enter into this litigation." At trial, and following the decease of the Special Master, it was found impossible to determine what that remark referred to; or assuming that it referred to a certain rack now the subject of contention, whether it simply meant that the pleadings as then framed did not cover it. Finally, it was found that there had been no acts or forbearances of the par-

ties in reliance on that statement; and if it did amount to any agreement, that agreement had been waived by subsequent conduct of the parties.

The chief vice of that alleged agreement was that it was void for vagueness —a ground for disregarding an alleged agreement which is as old as the law. By contrast, the present statements have been found readily subject to construction. The other principles involved are likewise distinguishable. Finding 23(1) e. g.

Russell v. United States, 320 F.2d 920, 923 (Ct.Cl.1963) is quoted extensively in support of the foregoing assertions of plaintiff. Close reading shows that the result does not support plaintiff's position here. Claimant wanted compensation for certain sick leave to which he might well have been entitled had he not been improperly separated from his government position. There was another case pending on the exact point—back pay for sick leave upon reinstatement: Vitarelli v. United States, 279 F.2d 878, 150 Ct.Cl. 59 (1960). Both parties in the Russell case agreed to await the decision in Vitarelli before proceeding further. Vitarelli was in the first instance decided in favor of claimant's contention. Hard on its heels came Zeiger, however—overruling Vitarelli. At the time of controversy, Zeiger was the established rule, and the Vitarelli rule was in the discard. Zeiger v. United States, 295 F.2d 915, 155 Ct.Cl. 353 (1961).

But claimant Russell said in effect "we agreed to abide by Vitarelli." The Court said, simply, that the agreement did not mean that the result in Vitarelli, *simpliciter,* was to control.

It is true that the Russell case contains an essay on the general rules of stipulations as quoted and cited by plaintiff. In its result, however, it backfires in plaintiff's face. Claimant Russell had insisted in essence that

"regardless of the fact that Vitarelli was promptly overruled, and has stayed overruled, our agreement was that Vitarelli alone would control."

That is comparable to the argument made by plaintiff here to the effect that

"we agreed that the test was to be *certiorari denied*—and the fact that certiorari, although granted, was unsuccessful is irrelevant."

Claimant Russell's argument for the literal interpretation was found not acceptable by the Court of Claims and, on somewhat parallel reasoning, the argument of plaintiff is rejected by this Court. It is proper to add, parenthetically, that there is more to the Russell case than it has been possible to discuss here, but it is at least clear that no help for plaintiff is to be found therein. Russell v. United States, 320 F.2d 920 (Ct. Cl.1963).

Three more cases and references are cited by the plaintiff for the proposition that general authority to conduct a case does not authorize counsel to dismiss or compromise a claim:

The first is a general statement from 7 C.J.S. Attorney and Client § 87 at 908, 909, which in a general way says two things: First: that special authorization is required for dismissal or discontinuance. That proposition is entirely acceptable and indeed accounts for this Court's insistence that counsel secure authorization in this respect before the preliminary pre-trial of August 21, 1963. Finding No. 23(7).

The second branch is the equally patent truism that an attorney cannot dismiss a suit unless he has been employed or retained with reference to that suit. It raises, however, this question: if Messrs. Sawyer, Steinberg, Williams and Ungar had not been retained, or had been dismissed as to Viking No. 2, why did not the docket so indicate? To the contrary, however, the testimony shows that plaintiff was in touch with his attorney, Mr. Williams, until the latter's withdrawal after all the disputed stipulations had taken place. Finding 23(8) to (13) incl.; Finding No. 27.

Preveden v. Hahn, 36 F.Supp. 952 (S.D. N.Y.1941) is cited under the foregoing. In that case, counsel admitted by affi-

davit that he had no authority to dismiss. That circumstance is simply not present here. The nearest intimation in that connection is the testimony of Mr. Straub that Mr. Sley was unhappy about the dilemma with which he was faced in 1963. II N.T. 50.

General or apparent authority does not suffice, says plaintiff, citing United States v. Beebe, 180 U.S. 343, 352, 21 S.Ct. 371, 374, 45 L.Ed. 563 (1901) and quoting language therefrom. In that case the government's claim for $28,000 against a defaulting Alabama Collector of Internal Revenue had been settled, according to a most questionable docket entry, for $100 by the U. S. Attorney. In the course of holding that a United States Attorney has no power to compromise a government case, the Court goes on to point out, in the 1812 words of Marshall, Ch. J., that

> "Although an attorney at law, merely as such, has, strictly speaking, no right to make a compromise; yet a court would be disinclined to disturb one which was not * * * unreasonable."

Without quarreling with all the foregoing principles as to an attorney's authority, the Court cannot see how they are applicable to the present agreement, based on notice and full hearings, and made as a choice in response to the Court's presentation of alternatives.

More to the point is a recent Sherman Act case decided June 4, 1965. Winckler & Smith Citrus Products Co. v. Sunkist Growers, Inc., 346 F.2d 1012 (9th Cir. 1965). Appeal had been taken from the trial court's judgment dismissing a private antitrust action pursuant to remand for new trial from the Court of Appeals for the 9th Circuit and the Supreme Court. The trial court's discretion in dismissing for want of prosecution was upheld, since it was not clearly erroneous, and was a proper exercise of judicial discretion. Particularly of interest was the circumstance that the trial court was upheld in its balancing of the oppressive and vexatious nature of the proceeding, on the one hand, with the fact that the identical issues had once been unsuccessfully tried.

Certain parallels between the last-described Winckler case and Viking No. 2 are obvious. On the other hand, there are substantial differences. But discussion of details will be omitted if only because there is said to be on file another Viking case, "Viking No. 3." II N.T. 70, 73. Nothing contained herein, including references to principles laid down in the Winckler case, is to be taken as referring to Viking No. 3. May it suffice to say that in the opinion of this Court, plaintiff is foreclosed from prosecuting the present case, Viking No. 2, and that—likewise in the opinion of this Court—no good purpose would have been served by allowing the case to proceed.

And now, for all the foregoing reasons, it is the ruling of this Court that the Motion to Dismiss heretofore filed by Defendants is granted, the Complaint herein will be and the same is hereby dismissed and it is so ordered.